**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

    v.

PETER VONGXAY,
          *Defendant-Appellant.*

No. 09-10072

D.C. No.
1:08-CR-00030-LJO

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted
January 12, 2010—San Francisco, California

Filed February 9, 2010

Before: Myron H. Bright,* Michael Daly Hawkins, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

*The Honorable Myron H. Bright, Senior United States Circuit Judge
for the Eighth Circuit, sitting by designation.

## COUNSEL

Daniel J. Broderick, Federal Defender, and Douglas J. Beevers, Assistant Federal Defender, Fresno, California, for defendant-appellant Peter Vongxay.

Lawrence G. Brown, United States Attorney, and Elana S. Landau, Assistant United States Attorney, Fresno, California, Attorneys for plaintiff-appellee United States of America.

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Defendant-Appellant Peter Vongxay appeals his conviction for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He challenges his conviction on three grounds. First, he argues that § 922(g)(1) violates the Second Amendment. Next, he asserts that § 922(g)(1) violates his right to equal protection under the Due Process Clause of the Fifth Amendment. Finally, he claims that the arresting officer's search violated his Fourth Amendment right to be free from unreasonable searches and seizures. We affirm the judgment of the district court on all Vongxay's claims.

### FACTUAL AND PROCEDURAL BACKGROUND

Vongxay was arrested outside the After Dark Nightclub, a known venue of gang activity and violence, which was located within the area patrolled by Officer Alfred Campos of the Fresno Police Department. The club was a known hangout

for at least two gangs: the Asian Crips and the Tiny Rascals. Based on his experience and training, Campos knew that these gang members typically dressed in blue L.A. Dodgers clothing. Campos testified that the two gangs engaged in "constant shootings at each other, armed with guns" and that they caused "disturbances."

On the night of Vongxay's arrest, Campos approached the After Dark Nightclub in a marked vehicle. He saw a group of Asian males loitering in front of the club dressed in the blue athletic apparel commonly worn by members of the gangs. As soon as the group noticed him they began to retreat out of the parking lot and funnel into the club. After calling for backup, Campos drove around the block and re-approached the club on foot. By that time, the same group of males had once again gathered outside the club. The first person Campos encountered was Vongxay. Campos "engaged in a conversation with him and asked him if he was leaving, or if he was going to go into the nightclub."

While Campos asked Vongxay about his presence at the club, he noticed that Vongxay appeared to be attempting to conceal something under his waistband. Specifically, Vongxay "turned his body to the left and kept his waist area away from [Campos] . . . [a]nd . . . he placed his left hand down towards his waist area as if he was covering something." Thinking that Vongxay was armed, Campos positioned himself behind Vongxay and asked him if he had any weapons. Vongxay said that he did not. Campos then asked Vongxay if he could search him for weapons. Vongxay did not verbally respond, but "placed his hands on his head." Campos began the search by feeling Vongxay's waistband and immediately felt the frame of a large handgun. As soon as Campos felt the gun, Vongxay attempted to pull away. A struggle ensued, and a loaded semiautomatic handgun fell from Vongxay's waistband. Vongxay continued to fight, bringing Campos down to the ground. It took the assistance

of additional officers and a Taser gun to overpower Vongxay and arrest him.

Vongxay was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Vongxay had three previous, non-violent felony convictions: two for car burglary and one for drug possession. Vongxay filed a motion to dismiss the indictment on the ground that § 922(g)(1) violates the Second Amendment. He also argued that § 922(g)(1) violates his right to equal protection under the Fifth Amendment Due Process Clause. Finally, he moved to suppress the gun that was seized from him, asserting that he did not consent to the search, and that Campos had violated his Fourth Amendment right to be free from unreasonable searches and seizures. The district court denied Vongxay's motions in an oral ruling, finding that Vongxay had consented to the search and that § 922(g)(1) does not violate either the Second or Fifth Amendments. After a two-day trial, a jury found Vongxay guilty of being a felon in possession of a firearm.

## JURISDICTION AND STANDARD OF REVIEW

We review the constitutionality of a statute de novo. *United States v. Jones*, 231 F.3d 508, 513 (9th Cir. 2000). We also review constitutional challenges to the district court's denial of a motion to dismiss de novo. *United States v. Palmer*, 3 F.3d 300, 305 (9th Cir. 1993). We review a district court's finding of consent to a search for clear error. *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 1990). We have jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

Vongxay appeals his conviction for being a felon in possession of a firearm. He argues that 18 U.S.C. § 922(g)(1) violates the Second Amendment, and the equal protection component of the Fifth Amendment Due Process Clause. He also argues that he was searched without his consent in viola-

tion of his Fourth Amendment right to be free from unreasonable searches and seizures.

## I.  Second Amendment Claim

### A.  *District of Columbia v. Heller*

Vongxay argues that 18 U.S.C. § 922(g)(1) violates his Second Amendment right to bear arms. Section 922(g)(1) reads:

> It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Vongxay cites no authority holding that 18 U.S.C. § 922(g)(1) violates the Second Amendment, but asserts that *District of Columbia v. Heller,* 128 S. Ct. 2783 (2008), requires that conclusion. He is mistaken. Nothing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1).

In *Heller*, a District of Columbia (D.C.) special policeman applied to register a handgun he wished to keep in his home for his personal protection. 128 S. Ct. at 2788. D.C. refused this request because it had a local ordinance making it a crime to carry an unregistered firearm, prohibiting the registration of handguns, and requiring residents to keep lawfully owned firearms unloaded and dissembled or bound by a trigger lock or similar device. *Id*. Heller filed suit on Second Amendment grounds, seeking to enjoin D.C. from enforcing the gun ordinance that prohibited him from keeping an unlicensed firearm in his home. He also challenged the trigger-lock requirement

to the degree it unduly restricted the use of a functional firearm in his home. *Id*.

**[1]** After analyzing the history of the Second Amendment, among other things, the Court held "that the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 128 S. Ct. at 2799. Its specific holding as to Heller was that D.C.'s "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Heller*, 128 S. Ct. at 2821-22. The majority then added:

> The Constitution leaves the District of Columbia a variety of tools for combating [the problem of handgun violence in this country], *including some measures regulating handguns*. But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the *absolute* prohibition of *handguns held and used for self-defense in the home*.

*Heller*, 128 S. Ct. at 2822 (emphases added) (internal citation omitted). Accordingly, Heller had the right to register and keep a loaded firearm in his home for self-defense, provided he was "not disqualified from the exercise of Second Amendment rights." *Id*. The Court explained how such a disqualification could occur, stating:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, *nothing in our opinion should be taken*

*to cast doubt on the longstanding prohibitions on the possession of firearms by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller,* 128 S. Ct. at 2816-2817 (emphasis added) (internal citation omitted). The Court further noted that "[w]e identify these *presumptively lawful regulatory measures* only as examples; our list does not purport to be exhaustive." *Heller,* 128 S. Ct. at 2817, n.26 (emphasis added). Thus, felons are categorically different from the individuals who have a fundamental right to bear arms,[1] and Vongxay's reliance on *Heller* is misplaced.

Vongxay nevertheless contends that the Court's language about certain long-standing restrictions on gun possession is dicta, and therefore not binding. We disagree. Courts often limit the scope of their holdings, and such limitations are integral to those holdings. Indeed, "[l]egal rulings in a prior opinion are applicable to future cases only to the degree one can ascertain from the opinion itself the reach of the ruling." *Penuliar v. Mukasey*, 528 F.3d 603, 614 (9th Cir. 2008); *see also* Black's Law Dictionary 1100 (7th ed. 1999) (defining dictum as a statement in an opinion that is "unnecessary to the decision in the case and therefore not precedential").

**[2]** Since *Heller* does not render § 922(g)(1) unconstitutional, we next consider the impact of other case law.

---

[1]In his dissent, Justice Stevens underscores the fact that *Heller* "limits the protected class to 'law abiding, responsible citizens.' " *Heller*, 128 S. Ct. at 2827 (Stevens, J., dissenting).

## B.    The Impact of Case Law Other Than *Heller* on the Constitutionality of Section 922(g)(1)

**[3]** In *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005), we held that § 922(g)(1) does not violate the Second Amendment rights of a convicted felon. However, we performed only minimal analysis of the claim because, at the time, we were bound by *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), which held that the Second Amendment does not confer an individual right to possess arms. *Younger*, 398 F.3d at 1192.[2] Like Vongxay, Younger argued that § 922(g)(1) unconstitutionally limits "firearm possession by categories of people who have not been deemed dangerous." Appellant Clydell Younger's Opening Br., 2004 WL 1810097 at *57 (Jul. 2, 2004). We declined to make a distinction between violent and non-violent felons and held that § 922(g)(1), which prohibits all felons from possessing firearms, was constitutional.

**[4]** The reasoning upon which *Younger* was based—that the Second Amendment does not give individuals a right to bear arms—was invalidated by *Heller*. However, we are still bound by *Younger*. *See In re Osborne*, 76 F.3d 306, 309 (9th Cir. 1996) (holding that "[f]irst, a panel of this court may not overrule a decision of a previous panel; only a court *in banc* has such authority" and "[s]econd, the doctrine of *stare decisis* concerns the *holdings* of previous cases, not the rationales" (internal citations omitted)). Therefore, *Younger* controls.[3]

---

[2]In *Younger* we also cited a Fifth Circuit case holding that, even though an individual right to bear arms was recognized in the Fifth Circuit, felon restrictions were permissible "narrowly tailored exception[s]" to the right. *Younger*, 398 F.3d at 1192 (citing *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004)); *see also* our discussion of *Everist infra* p. 2355.

[3]Prior to *Heller*, the Supreme Court upheld a previous version of the felon-in-possession statute. *Lewis v. United States*, 445 U.S. 55, 67 (1980). However, *Lewis* is not binding with regard to Vongxay's Second Amendment claim because it involved only Fifth and Sixth Amendment chal-

Although our legal inquiry ends with Younger, our holding is buttressed by the fact that *Younger* upheld the very type of gun possession restriction that the Supreme Court deemed "presumptively lawful." *Heller*, 128 S. Ct. at 2817 n.26.

Our examination of cases from other circuits and of historical gun restrictions also lends credence to the post-*Heller* viability of *Younger*'s holding. For example, prior to Heller, the Fifth Circuit upheld § 922(g)(1) as a "limited and narrowly tailored exception to the freedom to possess firearms, reasonable in its purposes and consistent with the right to bear arms protected under the Second Amendment." *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004). Fifth Circuit cases from that era are particularly instructive for post-*Heller* analyses because, even before *Heller*, the Fifth Circuit held that the Second Amendment guarantees an individual right to possess

lenges; no Second Amendment claim was presented. In fact, Lewis's Second Amendment reference was limited to a sentence that *Heller* itself minimizes, stating:

> No Second Amendment claim was raised or briefed by any party. In the course of rejecting the asserted challenge, the Court commented [on the Second Amendment] gratuitously, in a footnote . . . . It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued.

*Heller*, 128 S. Ct. at 2816 n.25.

*Lewis* is therefore inapposite to Vongxay's Second Amendment claim. On the other hand, in making its equal protection determination, the *Lewis* Court necessarily had to find (or assume) that the Second Amendment did not confer an individual, fundamental right to bear arms. *See Lewis*, 445 U.S. at 66 n.8. To the extent that the Second Amendment conclusion is considered essential to the decision, this court would be bound by *Lewis*. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). However, because *Younger* more clearly decided this issue on Second Amendment grounds, we need not engage in a protracted analysis of whether or not *Lewis*'s Second Amendment discussion was a reasoned decision or a "gratuitous" comment. *See Heller*, 128 S. Ct. at 2816 n.25.

guns. *See United States v. Emerson*, 270 F.3d 203, 260 (5th Cir. 2001). Thus, the Fifth Circuit determined that, although there is an individual right to bear arms, felon restrictions are permissible even under heightened scrutiny. *Everist*, 368 F.3d at 519 ("Irrespective of whether [the] offense was violent in nature, a felon has shown manifest disregard for the rights of others. He may not justly complain of the limitation on his liberty when his possession of firearms would otherwise threaten the security of his fellow citizens.").

In addition, the D.C. Circuit opinion that *Heller* affirmed recognized an individual right to bear arms. It held:

> [T]he government is [not] absolutely barred from regulating the use and ownership of pistols. The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("[G]overnment may impose reasonable restrictions on the time, place, or manner of protected speech . . . ."). Indeed, the right to keep and bear arms . . . was subject to restrictions at common law. We take these to be the sort of reasonable regulations contemplated by the drafters of the Second Amendment.

*Parker v. Dist. of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), *cert. granted in part sub nom. Dist. of Columbia v. Heller*, 552 U.S. 1035 (2007), *and aff'd*, 128 S. Ct. 2783 (2008).

We also note that to date "no court that has examined *Heller* has found 18 U.S.C. § 922(g) constitutionally suspect." *United States v. Baron*, Nos. CR-06-2095-FVS, CV-08-3048-FVS, 2008 WL 5102307, at *2 (E.D. Wash. Nov. 25, 2008); *see, e.g.*, *United States v. Smith*, 329 F. App'x 109, 111 (9th Cir. 2009) ("*Heller* did not disturb *Lewis*'s narrow holding—

that felons have no constitutional right to possess firearms.”); *United States v. Gilbert*, 286 F. App’x 383, 386 (9th Cir. 2008) (holding that, under *Heller*, convicted felons do not have the right to possess firearms). Thus, there appears to be a consensus that, even given the Second Amendment’s individual right to bear arms, felons’ Second Amendment rights can be reasonably restricted.

Denying felons the right to bear arms is also consistent with the explicit purpose of the Second Amendment to maintain “the security of a free State.” U.S. Const. amend. II; *see also Parker*, 478 F.3d at 399 (holding that “[r]easonable restrictions also might be thought consistent with a ‘well-regulated Militia,’ ” and noting that “felonious conduct” would render a person “unsuitable for service in the militia”). Felons are often, and historically have been, explicitly prohibited from militia duty. *See, e.g.*, D.C. Code § 49-401 (outlining current prohibition on felons in the militia).[4]

Finally, we observe that most scholars of the Second Amendment agree that the right to bear arms was “inextricably . . . tied to” the concept of a “virtuous citizen[ry]” that would protect society through “defensive use of arms against criminals, oppressive officials, and foreign enemies alike,” and that “the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) . . . .” Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986); *see also* Glenn Harlan Reynolds*, A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) (noting that felons “were excluded from the right to arms” because they were “deemed incapable of virtue”). We recognize, however, that the historical question has not been definitively resolved. *See* C. Kevin

---

[4]In *Heller*, the Court anticipated the need for such historical analyses, stating that “there will be time enough to expound upon the historical justifications for exceptions we have mentioned if and when those exceptions come before us.” 128 S. Ct. at 2821.

Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 714-28 (2009) (maintaining that bans on felon gun possession are neither long-standing nor supported by common law in the founding era).

[5] In sum, we hold that § 922(g)(1) does not violate the Second Amendment as it applies to Vongxay, a convicted felon. *See Younger*, 398 F.3d 1179.

## II.   Equal Protection Claim

Vongxay also argues that 18 U.S.C. § 922(g)(1) violates his equal protection right under the Due Process Clause of the Fifth Amendment because the status of "felon" is determined differently from state-to-state, thereby limiting the rights of criminals differently depending on the state in which they live. In response, the government contends that many federal statutes permissibly defer to differing state laws to define their terms.

Vongxay urges us to review § 922(g)(1) under strict scrutiny because, he claims, the right to bear arms is a fundamental right. We acknowledge Vongxay's contention that, if the right to bear arms is a fundamental right, rational basis analysis may no longer be appropriate for all Second Amendment challenges.[5] *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985) (explaining that equal protection claims based on membership in a protected class or unequal burdening of a fundamental right are reviewed under strict scrutiny). However, the Supreme Court has purposefully differentiated the right to bear arms generally from the more lim-

---

[5]Contrary to Vongxay's implication, *Heller* did not establish that Second Amendment restrictions must be reviewed under strict scrutiny. Instead, the Court "decline[d] to establish a level of scrutiny for evaluating Second Amendment restrictions," *Heller*, 128 S. Ct. at 2817 (referencing Justice Breyer's dissenting criticism of the failure to announce a level of scrutiny), stating only that rational-basis scrutiny is not appropriate, *Heller*, 128 S. Ct. at 2817 n.27.

ited right held by felons. *Heller*, 128 S. Ct. at 2816-2817 (holding that "like most rights, the right secured by the Second Amendment is not unlimited" and that "nothing in [this] opinion should be taken to case doubt on the longstanding prohibitions on the possession of firearms by felons"). Therefore, whatever standard of review the Court implicitly applied to Heller's right to keep arms in his home is inapplicable to Vongxay, a felon who was explicitly excluded from *Heller*'s holding. *Id.* Accordingly, we are bound by pre-*Heller* case law involving equal protection challenges to § 922(g).

**[6]** In *Lewis v. United States*, the Supreme Court rejected an equal protection challenge to the predecessor to § 922(g)(1), which proscribed the possession of firearms by any person (violent or non-violent) who "has been convicted by a court of the United States . . . of a felony." *Lewis*, 445 U.S. at 56 n.1. In *Lewis*, the Court applied a rational basis test because it found that the right to bear arms was not a fundamental right. Noting that statutes are "consonant with the concept of equal protection embodied in the Due Process Clause of the Fifth Amendment if there is some rational basis for the statutory distinctions made or they have some relevance to the purpose for which the classification is made," the Court determined that the felon-in-possession statute "clearly meets that test." *Id.* at 65-66 (internal quotation marks omitted).

**[7]** *Lewis* was, as Vongxay contends, based on the now-erroneous presumption that the Second Amendment does not apply to individuals (and is therefore not an individual fundamental right). *Lewis*, 445 U.S. at 65 n.8 ("[T]he Second Amendment guarantees no right to keep and bear a firearm that does not have some reasonable relationship to the preservation or efficiency of a well regulated militia." (internal quotation marks omitted)). However, because the right established by *Heller* does not apply to felons, we are still bound by *Lewis*'s holding. *See Rodriguez de Quijas*, 490 U.S. at 484; *see also State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its

precedents.”). For the reasons discussed *supra* Part I, we find this distinction between felons and non-felons grounded in both historical and modern understandings of the purpose of the Second Amendment. Therefore, we hold that § 922(g)(1) does not violate the equal protection guarantee of the Fifth Amendment.

## III.   Search and Seizure Claim

Vongxay also claims that Campos's pat-down search violated his Fourth Amendment right to be free from unreasonable searches and seizures. As a result, he argues that the district court erred in denying his motion to suppress the gun that was found in his waistband during the search. The district court denied Vongxay's motion to suppress the gun because it found that Vongxay had consented to Campos's search.

**[8]** Although Campos does not claim to have had probable cause to search Vongxay, he was nonetheless entitled to ask Vongxay some questions, including whether or not he would consent to a search, so long as the consent was not coerced. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). The government bears the burden of proving consent, *United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984), and it must prove that the consent was freely and voluntarily given, *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Voluntariness is a question of fact to be determined from all the surrounding circumstances. *United States v. Perez-Lopez*, 348 F.3d 839, 845-46 (9th Cir. 2003).

The encounter in question began when Campos approached Vongxay on foot and, after some preliminary questions about this presence at the club, asked him if he had a gun. Vongxay said "no." Campos then asked Vongxay if he could search him for weapons. Vongxay did not answer verbally, but placed his hands on his head. After Campos began the search and felt the semiautomatic handgun in Vongxay's waistband, Vongxay attempted to pull away, leading to a prolonged

struggle that ended only with the assistance of additional officers. Vongxay contends that, by putting his hands in the air, he was not consenting but rather was "submi[tting] to an arrest."

In general, we consider five factors in determining whether consent was voluntarily given: (1) whether the defendant was in custody; (2) whether the arresting officer had his guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that he had a right not to consent; and (5) whether the defendant had been told that a search warrant could be obtained. *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002). All five factors need not be satisfied in order to sustain a consensual search. *United States v. Cormier*, 220 F.3d 1103, 1113 (9th Cir. 2000). Here, Vongxay was not in custody, and Campos did not have his gun drawn or exposed when he asked permission to search Vongxay. Vongxay had not yet been arrested, so the *Miranda* warning factor is inapplicable. *See United States v. Ritter*, 752 F.2d 435, 438 (9th Cir. 1985) ("It would . . . make little sense to require that *Miranda* warnings . . . be given by police before requesting consent."). Vongxay was not told that a search warrant could be obtained. Thus, the only *Jones* factor not satisfied here is that Vongxay was not notified of his right to decline consent.[6]

[9] Further, Campos's conduct would not have "communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988). Vongxay willingly lifted his arms, so as to enable a search, in response to Campos's request for permission to search him. Given the facts surrounding the search, Vongxay's attempt to pull away after the gun was found is better understood as a flight

---

[6]An officer is not *required* to inform the person being searched that he has a right to refuse consent; doing so simply weighs in favor of finding consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27(1973).

response than as evidence that he had not consented in the first place.

**[10]** The district court found that Vongxay's act of raising his hands to his head constituted implied consent to search. It also found that "[t]here were no threats, coercion or otherwise." Considering the totality of the circumstances, we do not find that the district court's finding of consent was clearly erroneous. We therefore affirm the denial of Vongxay's motion to suppress.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Vongxay's motion to dismiss and AFFIRM the denial of Vongxay's motion to suppress.