Filed 11/20/13  P. v. Andrade CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>NICKOLAS JOHN ANDRADE,<br><br>Defendant and Appellant. | C069679<br><br>(Super. Ct. No. 11F04150) |

Defendant Nickolas John Andrade is a felon who was found to be in possession of two firearms and ammunition in his home.  He was convicted by jury of possession of a firearm by a felon (Pen. Code, former § 12021, subd. (a)(1);[1] Stats. 2008, ch. 599, § 4), possession of ammunition by a felon (former § 12316, subd. (b)(1); Stats 2005, ch. 681, § 1), and receiving stolen property (§ 496, subd. (a)).  The trial court sentenced defendant to serve 16 months in state prison and imposed other orders.

On appeal, defendant asserts a single claim of error:  "The Second Amendment to the United States Constitution . . . prohibits the enforcement of laws denying persons who have prior felony convictions any privilege of keeping firearms or ammunition in their

---

[1]    Undesignated statutory references are to the Penal Code.

1

homes for purposes of self-protection." He is mistaken. As we explain, while the Second Amendment protects the right of law-abiding citizens to possess firearms for lawful purposes, and particularly self-defense within one's home, "a felony conviction disqualifies an individual from asserting that interest. [Citations.] This is so, even if a felon arguably possesses just as strong an interest in defending himself [or herself] and his [or her] home as any law-abiding individual." (*United States v. Marzzarella* (3d Cir. 2010) 614 F.3d 85, 92; *United States v. Rozier* (11th Cir. 2010) 598 F.3d 768, 771 (*Rozier*).) We therefore affirm the judgment.

FACTS

The events leading police to defendant's home are immaterial to the issue raised on appeal, as are the facts surrounding his conviction for receiving stolen property. For our purposes, it will suffice to state substantial evidence supports the fact defendant routinely bought stolen property from people in the neighborhood, which he would then resell for a profit.

With respect to the convictions at issue in this appeal, defendant admitted to one of the responding officers that he was a convicted felon and he possessed two firearms in his home, a rifle and a handgun. Defendant told the officer where the firearms were located and gave consent for the officer to enter the house to retrieve them. As promised, a .44-caliber handgun was found in an entryway closet and a .22-caliber rifle was found in a bedroom closet. The rifle had one round in the chamber and 12 rounds in the attached magazine. The handgun was not loaded, but five rounds were found in the box in which the handgun was located. At trial, the parties stipulated to defendant's prior felony conviction.

Defendant and his wife, Audrey Aquino, testified in his defense. Aquino testified that one of defendant's friends brought her the rifle to use for self-defense after two incidents in which strangers entered the backyard while she was home alone. In the first incident, a man entered the backyard, threatened to shoot her if she called the police, and jumped over the fence and into her neighbor's yard. In the second incident, a man

2

entered the backyard and stole a bicycle. She kept the rifle behind the door in the spare bedroom. Sometime later, a man kicked in the front door to the house. Aquino ran to the bedroom, grabbed the rifle, and called 911. The man stole a laptop and ran away. A few months later, defendant answered a knock at the front door and was confronted by four men. One of the men had a gun and "pistol whipped" defendant while the other three ransacked the house. Aquino was ordered to "shut up" and "get on the ground." The men stole four laptops.

Defendant testified he bought the handgun for protection about six weeks after this incident. As he explained: "I know I can put a .44 round through the front door, and once they hear that thing go off, it's not no little pop gun. You and I, everybody I know, would be very fearful hearing a large powerful weapon go off. [¶] And it's my belief that would be enough to send these people flying from my front door if they decided to try to do something in there. And if they continued, God bless it, I would have to blast away at them. Simple as that. [¶] I give them a chance. If [they're] not going to let it go, still going to come after me, I have my wife to protect. That's my interest. This is a beautiful young woman. It would kill me to have something happen to that gal. Just kill me. I couldn't handle it." Defendant continued: "I'm not going to bury that woman. Hell no. I'll die first. I'll die blasting away at them with that .44."

In the People's rebuttal case, the officer who retrieved the firearms from defendant's house testified he also spoke to Aquino at the scene. She was angry and told the officer she no longer lived with defendant because he "was on a daily basis buying stolen property from individuals that would come up from the neighborhood to the house." When asked about the firearms that were found in the house, Aquino "stated that she had no knowledge that they were in the house."

## DISCUSSION

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.)

In *District of Columbia v. Heller* (2008) 554 U.S. 570 [171 L.Ed.2d 637] (*Heller*), the United States Supreme Court held "the [District of Columbia's] ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." (*Id*. at p. 635.)  In so holding, the court explained the Second Amendment codified a pre-existing right of the individual "to possess and carry weapons in case of confrontation." (*Id*. at p. 592.)  However, the court was careful to point out that, much like the First Amendment's right to freedom of speech, the Second Amendment's right to bear arms is not unlimited:  "Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." (*Id*. at p. 595.)  Nor does the Second Amendment's protection extend to any type of weapon. Rather, it is a right to possess and carry weapons "typically possessed by law-abiding citizens for lawful purposes." (*Id*. at p. 625.)

Turning to the District of Columbia's handgun ban, the court explained:  "[T]he inherent right of self-defense has been central to the Second Amendment right.  The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose.  The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' [citation], would fail constitutional muster." (*Heller*, *supra*, 554 U.S. at p. 628.)  With respect to the requirement that firearms in the home be rendered inoperable, the court explained:  "This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." (*Id*. at p. 630.)  However, the court was careful to point out:  "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive

4

places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." (*Id.* at pp. 626-627.) The court further noted: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." (*Id.* at p. 627, fn. 26.)[2]

In *United States v. Marzzarella*, *supra*, 614 F.3d 85, the United States Court of Appeals for the Third Circuit provided a compelling interpretation of this "presumptively lawful" language. The court stated: "We recognize the phrase 'presumptively lawful' could have different meanings under newly enunciated Second Amendment doctrine. On the one hand, this language could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster under any standard of scrutiny. Both readings are reasonable interpretations, but we think the better reading, based on the text and the structure of *Heller*, is the former — in other words, that these longstanding limitations are exceptions to the right to bear arms. Immediately following the above-quoted passage, the Court discussed 'another important limitation' on the Second Amendment — restrictions on the types of weapons individuals may possess. [Citation.] The Court made clear that restrictions on the possession of dangerous and unusual weapons are not constitutionally suspect because these weapons are outside the ambit of the amendment. [Citation.] By equating the list of presumptively lawful regulations with restrictions on dangerous and unusual weapons, we believe the Court intended to treat them equivalently — as exceptions to the Second Amendment guarantee." (*Id.* at p. 91, fn. omitted.)

---

[2]     In *McDonald v. City of Chicago* (2010) 561 U.S. ___ [177 L.Ed.2d 894], the United States Supreme Court held the Second Amendment right recognized in *Heller* is "fully applicable to the States." (*Id.* at p. 903 (plur. opn. of Alito, J.); *id.* at p. 938 (conc. opn. of Thomas, J.).)

The court continued: "This reading is also consistent with the historical approach *Heller* used to define the scope of the right. If the Second Amendment codified a pre-existing right to bear arms, [citation], it codified the pre-ratification understanding of that right, [citation]. Therefore, if the right to bear arms as commonly understood at the time of ratification did not bar restrictions on possession by felons or the mentally ill, it follows that by constitutionalizing this understanding, the Second Amendment carved out these limitations from the right. Moreover, the specific language chosen by the Court refers to 'prohibitions' on the possession of firearms by felons and the mentally ill. [Citation.] The endorsement of prohibitions as opposed to regulations, whose validity would turn on the presence or absence of certain circumstances, suggests felons and the mentally ill are disqualified from exercising their Second Amendment rights. The same is true for 'laws forbidding the carrying of firearms in sensitive places.' [Citation.]" (*United States v. Marzzarella*, *supra*, 614 F.3d at pp. 91-92, fns. omitted.)

The court concluded: "Accordingly, *Heller* delineates some of the boundaries of the Second Amendment right to bear arms. At its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home. [Citation.] And certainly, to some degree, it must protect the right of law-abiding citizens to possess firearms for other, as-yet-undefined, lawful purposes. [Citation.] The right is not unlimited, however, as the Second Amendment affords no protection for the possession of dangerous and unusual weapons, possession by felons and the mentally ill, and the carrying of weapons in certain sensitive places. [Citation.] [¶] But *Heller* did not purport to fully define all the contours of the Second Amendment, [citation], and accordingly, much of the scope of the right remains unsettled. While the Second Amendment clearly protects possession for certain lawful purposes, it is not the case that all possession for these purposes is protected conduct. For example, although the Second Amendment protects the individual right to possess firearms for defense of hearth and home, *Heller* suggests, and many of our sister circuits have held, a felony conviction disqualifies an individual from asserting that interest. [Citations.] This is so, even if a

6

felon arguably possesses just as strong an interest in defending himself [or herself] and his [or her] home as any law-abiding individual." (*United States v. Marzzarella*, *supra*, 614 F.3d at p. 92, fns. omitted.)

One such case is *Rozier*, *supra*, 598 F.3d 768. There, the United States Court of Appeals for the Eleventh Circuit held that the defendant's conviction under title 18 of the United States Code, section 922(g)(1), for possession of a firearm and ammunition by a convicted felon did not violate the Second Amendment even though the court assumed for purposes of the opinion that the firearm was possessed in the defendant's home and for purposes of self-defense. (*Id*. at pp. 770-771.) The court explained: "When issuing its ruling and settling the actual case and controversy at issue, *Heller* stated, '[a]ssuming that Heller *is not disqualified* from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home.' [Citation.] This indicates that the first question to be asked is not whether the handgun is possessed for self-defense or whether it is contained within one's home, rather the initial question is whether one is *qualified* to possess a firearm." (*Id*. at p. 770.) The court continued: "*Heller* stated that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . .' [Citation.] This language suggests that statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." (*Id*. at p. 771, fn. omitted; see also *United States v. Vongxay* (2010) 594 F.3d 1111, 1115 ["felons are categorically different from the individuals who have a fundamental right to bear arms"]; *United States v. McCane* (10th Cir. 2009) 573 F.3d 1037, 1047; *United States v. Anderson* (5th Cir. 2009) 559 F.3d 348, 352.)

California cases have followed the same approach. In *People v. Delacy* (2011) 192 Cal.App.4th 1481 (*Delacy*), our colleagues at the First District Court of Appeal upheld the defendant's convictions for unlawful firearm and ammunition possession where the firearms and ammunition were found during probation searches of the defendant's home. (*Id*. at p. 1486.) There, the defendant challenged the constitutionality

of former section 12021, subdivision (c)(1), which prohibited the possession of firearms by persons convicted of specified misdemeanors.  The court explained:  "[T]here is a significant difference between the D.C. handgun ban and [former] section 12021.  The D.C. statute was one of general application that did not fit within the traditional regulations described by *Heller* as 'presumptively lawful.'  [Citation.]  In contrast, as [*People v. Flores* (2008) 169 Cal.App.4th 568] held, [former] section 12021 is analogous to a prohibition on felon weapon possession, a type of restriction expressly listed by *Heller* as untouched by its holding.  Relying on this reasoning, both California and federal decisions have upheld the type of 'presumptively lawful' regulations identified in *Heller*, including prohibitions on firearm possession by certain 'disqualified' persons, without applying constitutional scrutiny that balances the objectives of the statute against the means used to accomplish those ends."  (*Delacy* at p. 1489.)  The court then described *United States v. Vongxay*, *supra*, 594 F.3d 1111 and *United States v. Marzzarella*, *supra*, 614 F.3d 85, and cited a number of other federal cases.  (*Delacy*, *supra*, 192 Cal.App.4th at pp. 1489-1490; see, e.g., *United States v. White* (11th Cir. 2010) 593 F.3d 1199, 1205-1206; but see *United States v. Chester* (4th Cir. 2010) 628 F.3d 673, 679 ["the phrase '*presumptively* lawful regulatory measures' suggests the possibility that one or more of these 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge' "].)

In this case, like *Rozier*, *supra*, 598 F.3d 768, and *Delacy*, *supra*, 192 Cal.App.4th 1481, defendant was found to be in possession of a firearm and ammunition in his home.  Even assuming he possessed these items for purposes of self-defense, we nevertheless conclude defendant's status as a convicted felon disqualifies him from asserting the protection of the Second Amendment.  "This is so, even if a felon arguably possesses just as strong an interest in defending himself [or herself] and his [her] home as any law-abiding individual."  (*United States v. Marzzarella*, *supra*, 614 F.3d at p. 92.)  Because defendant's conduct falls outside the scope of the Second Amendment's protection, we need not balance the objectives of the statute against the means used to accomplish those

ends. (*Delacy*, *supra*, 192 Cal.App.4th at p. 1489.) Like the *Delacy* court, we conclude *Heller* did not "intend[] to open felon-in-possession prohibitions and similar categorical weapons possession bans to constitutional means-ends scrutiny. On the contrary, following virtually all other federal and California appellate courts, we read *Heller's* 'presumptively lawful' language to do just the opposite." (*Delacy, supra,* at pp. 1491-1492.)

In any event, even if defendant's status as a convicted felon was not enough, by itself, to prevent him from prevailing in this appeal, we would still reject his as-applied challenge. In *United States v. Smoot* (4th Cir. 2012) 690 F.3d 215, the United States Court of Appeals for the Fourth Circuit rejected the defendant's argument that "he was entitled under the Second Amendment to possess a firearm in his home for self-defense purposes" despite his status as a convicted felon. (*Id*. at p. 219.) Acknowledging prior Fourth Circuit cases (*United States v. Chester*, *supra*, 628 F.3d at p. 679; *United States v. Moore* (4th Cir. 2012) 666 F.3d 313, 319) found there to be a "possibility that presumptively lawful measures could yet be unconstitutional if confronted with a proper as-applied challenge," the court explained the defendant's particular criminal history was such that he could "hardly be considered a 'law-abiding responsible citizen,' " and "therefore cannot avail himself [or herself] of whatever succor *Heller* may offer." (*Smoot, supra,* at p. 221; see also *United States v. Moore*, *supra*, 666 F.3d at p. 319 ["Moore simply does not fall within the category of citizens to which the *Heller* court ascribed the Second Amendment protection of 'the right of *law-abiding responsible citizens* to use arms in defense of hearth and home' "].) Here, aside from defendant's felony conviction, the evidence reveals he was engaged in ongoing criminal activity at the time the firearms and ammunition were found in his home. And while defendant undoubtedly intended to use the firearms to defend himself and his wife from intruders, the need for such defense was created in no small part by the fact defendant bought and sold stolen property out of his house. Thus, even if defendant's status as a convicted

9

felon did not, by itself, remove him from the category of law-abiding responsible citizens protected by the Second Amendment, his ongoing criminal behavior certainly does.

Defendant's convictions for possession of a firearm and ammunition by a felon do not violate the Second Amendment.

DISPOSITION

The judgment is affirmed.


                                    HOCH     , J.


We concur:


      BLEASE     , Acting P. J.


      MAURO     , J.