# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 11, 2018   Decided January 18, 2019

No. 17-5248

JORGE L. MEDINA,
APPELLANT

v.

MATTHEW G. WHITAKER,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01718)

---

*Alan Gura* argued the cause for appellant. With him on the briefs was *Jason D. Wright*.

*Patrick G. Nemeroff*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *Mark B. Stern* and *Michael S. Raab*, Attorneys.

Before: ROGERS and PILLARD, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*:    Jorge Medina was convicted of falsifying his income on mortgage applications twenty-seven years ago. Now, as a convicted felon, he is prohibited from owning firearms by federal law. He argues that the application of this law to him violates the Second Amendment because he poses no heightened risk of gun violence. Because we conclude that felons are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment, we reject his contention and affirm the district court's dismissal order.

## I.    Factual Background

In 1990, Medina committed a felony. He grossly misrepresented his income on a mortgage finance application to qualify for a $30,000 loan from the First Federal Bank of California. He was referred for criminal prosecution by the bank. He cooperated with the investigation, confessed to his crime, and pled guilty in 1991 to a felony count of making a false statement to a lending institution in violation of 18 U.S.C. § 1014. Although his crime was punishable by up to thirty years in prison, Medina was sentenced to only three years of probation, home detention for sixty days, and a fine. At the recommendation of the U.S. Attorney, the U.S. Probation Officer, and members of the community, Medina's probation was terminated after only one year.

In the mid-1990s, Medina had another run-in with the law. In 1994 and 1995, he applied for resident hunting licenses in the state of Wyoming, while not actually residing in that state. He claims that the false statements were predicated on a misunderstanding about the residency requirements. Nevertheless, in 1996, he pled guilty to three

misdemeanor counts of making a false statement on a game license application in violation of Wyo. Stat. Ann. § 23-3-403 (1989). The crime was classified as a misdemeanor and was punishable by a fine and six months' imprisonment. Wyo. Stat. Ann. § 23-6-202(a)(v) (1981). Medina was sentenced to an eight-year hunting license revocation and a fine.

Medina has no further criminal record since his 1996 conviction. He owns a successful business, supports a family, and engages in philanthropy. His rehabilitation has been recognized by several important institutions. The California real estate licensing board has continued to license him following his 1991 conviction. The government of Canada restored his right to enter the country in 2009. Even the victim of Medina's false statement, the First Federal Bank of California, recognized his trustworthiness in 2005 by extending him a $1,000,000 line of credit.

Notwithstanding his past misdeeds, Medina wants to own a firearm for self-defense and recreation. He cannot do so, however, because his 1991 felony conviction bars him from possessing firearms under federal law.

## II. Legal Background

Since 1968, anyone convicted of "a crime punishable by imprisonment for a term exceeding one year" is prohibited from owning firearms for life under 18 U.S.C. § 922(g)(1). Exempted from this prohibition are those convicted of antitrust violations, those convicted of state misdemeanors with a maximum term of imprisonment of two years or less, and those whose convictions have been pardoned or expunged. 18 U.S.C. § 921(a)(20). Although the prohibition applies for life, the statute allows the Attorney General to restore firearm rights to those deemed not "likely to act in a manner dangerous to public safety." 18 U.S.C. § 925(c). This

remedy has been unavailable since 1992, however, because Congress has prohibited the Attorney General from using public funds to investigate relief applications. To justify this decision, Congress cited the difficulty of the task and the fact that a wrong decision could result in "devastating consequences." S. Rep. No. 102-353 (1992).

In 2008—forty years after the enactment of this statute—the Supreme Court issued its decision in *District of Columbia v. Heller*, which clarified that the Second Amendment protects the right of individual Americans to keep and bear firearms for self-defense. 554 U.S. 570, 595 (2008). This right, like other fundamental rights, is not unlimited in scope. In *Heller,* and again in *McDonald v. City of Chicago*, the Court explained that the recognition of an individual right to bear firearms does not "cast doubt on longstanding prohibitions on the possession of firearms by felons." *Heller,* 554 U.S. at 626; *McDonald*, 561 U.S. 742, 786 (2010). The practice of barring convicted felons from possessing firearms is a "presumptively lawful regulatory measure[]." *Heller*, 554 U.S. at 627 n.26.

Notwithstanding the Supreme Court's statements concerning felon disarmament, the constitutionality of § 922(g)(1) has been challenged several times. Litigation has taken the form of both facial challenges to the statute and challenges to the law's application in particular circumstances. Facial challenges to the statute's constitutionality have failed in every circuit to have considered the issue. *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013) (per curiam); *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011) (overruled on other grounds by *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016)); *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011);

*United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011); *United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009).

As-applied challenges have fared only marginally better, and no circuit has held the law unconstitutional as applied to a convicted felon. The Ninth Circuit takes the view that "felons are categorically different from the individuals who have a fundamental right to bear arms." *Vongxay,* 594 F.3d at 1115. Four other circuits have, in a similar vein, also rejected as-applied challenges by convicted felons. *See Hamilton v. Pallozzi,* 848 F.3d 614, 626–27 (4th Cir. 2017), *cert. denied,* 138 S. Ct. 500 (2017); *United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009). The Seventh and Eighth Circuits, while leaving open the possibility of a successful felon as-applied challenge, have yet to uphold one. *See United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014); *United States v. Williams*, 616 F.3d 685, 693–94 (7th Cir. 2010).

Only one court has held § 922(g)(1) unconstitutional in any of its applications. In *Binderup v. Attorney General*, the Third Circuit, en banc, considered the application of the law to two misdemeanants and issued a well-reasoned opinion, concurrence, and dissent that illustrates the various viewpoints in this debate. 836 F.3d 336 (3d Cir. 2016), *cert. denied*, 137 S. Ct. 2323 (2017). The court ultimately concluded that the law was unconstitutional as applied, but split sharply on the reasoning. The narrowest ground supporting the judgment held that those who commit serious

crimes forfeit their Second Amendment right to arms. *Id.* at 349. It further held that the "passage of time or evidence of rehabilitation" could not restore the lost right; only the seriousness of the crime was relevant to determine if a convicted criminal fell outside the scope of the Second Amendment. *Id.* at 349–50. Applying this reasoning, the misdemeanor crimes at issue in that case were not sufficiently serious to warrant disarmament. *Id.* at 353. In a concurrence to the judgment, five judges disagreed with the seriousness test and took the view "that non-dangerous persons convicted of offenses unassociated with violence may rebut the presumed constitutionality of § 922(g)(1) on an as-applied basis." *Id.* at 357–58. (Hardiman, J., concurring in the judgment). Finally, seven judges dissented from the judgment and would have rejected the as-applied challenge to § 922(g)(1). Although they agreed that the proper focus was on the seriousness of the crime, they were satisfied that crimes encompassed by the statute were sufficiently serious to warrant disarmament. *Id.* at 381 (Fuentes, J., dissenting from the judgment).

In our 2013 *Schrader v. Holder* decision, we joined our sister circuits in rejecting a categorical Second Amendment challenge to § 922(g)(1). 704 F.3d 980, 989 (D.C. Cir. 2013). In that case, Schrader was barred from possessing firearms because of a forty-year-old, common-law misdemeanor charge arising from a fistfight. *Id.* at 983. Although he was only sentenced to a $100 fine, the misdemeanor carried no maximum possible term of incarceration—triggering the lifetime firearm prohibition under § 922(g)(1). *Id.* Schrader argued that the statute violated the Second Amendment when applied to misdemeanants such as himself because it deprived law-abiding citizens of their right to bear arms. *Id.* at 984. To resolve this claim, we applied the familiar two-step Second Amendment analysis used by circuits throughout the country

and adopted by this Court in *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011). The first step requires us to consider whether the challenged law regulates conduct "outside the Second Amendment's protections." *Schrader*, 704 F.3d at 988–89. If so, our inquiry ends, and only rational basis scrutiny applies. If the law regulates activity protected by the Second Amendment, however, the second step of the analysis shifts the burden to the government to show that the regulation is "substantially related to an important governmental objective." *Id.* at 989. Applying this test to Schrader's claim, we found it unnecessary to apply step one because the law survived intermediate scrutiny even if it did regulate conduct within the scope of the Amendment. *Id.* The government's interest in reducing crime was important and bore a substantial relationship to prohibiting firearm ownership by "individuals with prior criminal convictions." *Id.* at 989–90.

Although we upheld the facial constitutionality of § 922(g)(1), we did not decide the constitutionality of the statute as applied to Schrader individually. *Id*. at 991. Schrader had not challenged the application of the statute to himself, but rather to common-law misdemeanants as a class. We noted in dicta that, had he brought an individual as-applied challenge, the length of time between Schrader's minor misdemeanor and the intervening years of law-abiding behavior would make us hesitant "to find Schrader outside the class of law-abiding, responsible citizens whose possession of firearms is, under *Heller*, protected by the Second Amendment." *Id.* (internal quotations omitted). Ultimately, however, we declined to consider such an argument for the first time on appeal. *Id.*

### III. Procedural Background

Seizing upon the dicta in *Schrader*, Medina challenges the application of § 922(g)(1) to himself individually. He argues that his responsible life for many years, the nonviolent nature of his felony conviction, and the lack of evidence that he poses a heightened risk of gun violence, all make the law unconstitutional as applied to him. He sued the Attorney General on August 24, 2016, to enjoin the enforcement of the statute. *Medina v. Sessions*, 279 F. Supp. 3d 281 (D.D.C. 2017). The Government moved to dismiss.

The district court relied on our opinion in *Schrader v. Holder* to grant the Government's motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Id.* at 289. The court applied both steps of the *Schrader* analysis. First, it held that Medina failed the first step because convicted felons fall outside of the Second Amendment's protection. *Id.* It cited the decisions of several other circuits in support of its conclusion that the Founders would have considered a convicted felon like Medina to be "unable to claim the right to bear a firearm." *Id.* at 289–91. Alternatively, the district court held that, even if Medina did fall within the scope of the Second Amendment's protection, the law would survive the intermediate scrutiny analysis required by the second step of *Schrader*. *Id.* at 291–92. The government's important interest in public safety was substantially related to the law, and Congress was not limited to "case-by-case exclusions of persons who have been shown to be untrustworthy with weapons." *Id.* at 291–92 (quoting *Schrader*, 704 F.3d at 991). Therefore, the district court granted the Government's motion to dismiss. Medina timely noticed this appeal.

## IV. Analysis

We review the dismissal of Medina's complaint de novo. *Schrader*, 704 F.3d at 984. On appeal, Medina reiterates the constitutional arguments made below and contests both prongs of the district court's *Schrader* analysis. At step one, he argues that the district court erred when it found him outside the scope of the Second Amendment's protections because only those who are "dangerous" may be disarmed. He asserts that the district court was incorrect to conclude that "disregard for the law" was sufficient to justify disarmament. Medina also argues the district court failed to conduct a sufficiently individualized assessment of his crime, his life, and his rehabilitation before deciding that he was not within the scope of the Second Amendment. At step two, Medina claims that the district court should not have applied intermediate scrutiny at all. He argues that, once he shows that he is not dangerous, an outright prohibition on his right to possess firearms is indistinguishable from the ban struck down in *Heller* and fails under any form of scrutiny.

### A.

The district court concluded that Medina was not within the scope of the Second Amendment because his commission of a serious crime removes him from the category of "law-abiding and responsible" citizens. Medina challenges this and asserts that evidence of past "disregard for the law" is insufficient to disarm him. In his view, the scope of the Second Amendment only excludes dangerous individuals. Since the government cannot show that he is particularly dangerous, it offends the Second Amendment to bar him from possessing firearms.

To resolve this question, we must look to tradition and history. "Constitutional rights are enshrined with the scope

they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. We recall Justice Scalia's admonishment that "[h]istorical analysis can be difficult" and that it involves "making nuanced judgments about which evidence to consult and how to interpret it." *McDonald*, 561 U.S. at 803–04 (Scalia, J., concurring). The Second Amendment was ratified in 1791, so we look to the public understanding of the right at that time to determine if a convicted felon would fall outside the scope of its protection.

As a starting point, we consider felony crime as it would have been understood at the time of the Founding. In 1769, William Blackstone defined felony as "an offense which occasions a total forfeiture of either lands, or goods, or both, at the common law, and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, Commentaries on the Laws of England *95 (Harper ed. 1854). Felonies were so connected with capital punishment that it was "hard to separate them." *Id.* at *98. Felony crimes in England at the time included crimes of violence, such as murder and rape, but also included non-violent offenses that we would recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army. *Id.* at *90-103. Capital punishment for felonies was "ubiquit[ous]" in the late Eighteenth Century and was "the standard penalty for all serious crimes." *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (citing Stuart Banner, The Death Penalty: An American History 23 (2002)). For example, at the time of the Second Amendment's ratification, nonviolent crimes such as forgery and horse theft were capital offenses. *E.g.,* Banner, *supra*, at 18 (describing the escape attempts of men condemned to die for forgery and horse theft in Georgia between 1790 and 1805).

Admittedly, the penalties for many felony crimes quickly became less severe in the decades following American independence and, by 1820, forfeiture had "virtually disappeared in the United States." Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 468, 473 (2009). Nevertheless, felonies were—and remain—the most serious category of crime deemed by the legislature to reflect "grave misjudgment and maladjustment." *Hamilton*, 848 F.3d at 626. With this perspective, it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.

Next, we consider whether historical evidence suggests that *only* dangerous persons could be disarmed. None of the sources cited by Medina compels this conclusion. In fact, one source he cites, a 1787 proposal before the Pennsylvania ratifying convention, supports precisely the opposite understanding. The text of that proposal states: "no law shall be passed for disarming the people or any of them unless *for crimes committed*, or real danger of public injury from individuals." The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents, *reprinted in* Bernard Schwartz, 2 The Bill of Rights: A Documentary History 662, 665 (1971) (emphasis added). The use of the word "or" indicates that criminals, in addition to those who posed a "real danger" (such as the mentally ill, perhaps), were proper subjects of disarmament. Additionally, during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States. *See United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) (citing Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun*

*Control*, 73 Fordham L. Rev. 487, 506 (2004)). As these examples show, the public in the founding era understood that the right to bear arms could exclude at least some nonviolent persons.

A number of other circuits have also considered this issue and have concluded that history and tradition support the disarmament of those who were not (or could not be) virtuous members of the community. At least four circuits have endorsed the view that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010). *See also United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010); *Binderup v. Attorney General*, 836 F.3d 336, 348 (3d Cir. 2016)[1]; *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012). The "virtuous citizen" theory is drawn from "classical republican political philosophy" and stresses that the "right to arms does not preclude laws disarming the unvirtuous (i.e. criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue." *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) (quoting Glenn Harlan Reynolds*, A Critical Guide to the Second Amendment,* 62 Tenn. L. Rev. 461, 480 (1995)). Several circuits have relied on this theory to uphold the constitutionality of modern laws banning the possession of firearms by illegal aliens and juveniles—classes of people who might otherwise show, on a case-by-case basis, that they are not particularly dangerous. *See Carpio-Leon*, 701 F.3d at 979–81; *Rene E.*, 583 F.3d at 15. In considering these decisions, we recognize that there is "an ongoing debate

---

[1] This rationale was supported by seven of the fifteen judges of the en banc court. *Binderup*, 836 F.3d at 339.

among historians about the extent to which the right to bear arms in the founding period turned on concerns about the possessor's virtue." *Rene E.*, 583 F.3d at 16. While we need not accept this theory outright, its support among courts and scholars serves as persuasive evidence that the scope of the Second Amendment was understood to exclude more than just individually identifiable dangerous individuals.

With few primary sources directly on point, we finally consider the guidance from the Supreme Court in *Heller.* Although the Court declined to "expound upon the historical justifications" for felon firearm prohibitions, it described them as "longstanding" and "presumptively lawful." *Heller*, 554 U.S. at 626, 627 n.26, 635. Felonies encompass a wide variety of non-violent offenses, and we see no reason to think that the Court meant "dangerous individuals" when it used the word felon.

On balance, the historical evidence and the Supreme Court's discussion of felon disarmament laws leads us to reject the argument that non-dangerous felons have a right to bear arms. As a practical matter, this makes good sense. Using an amorphous "dangerousness" standard to delineate the scope of the Second Amendment would require the government to make case-by-case predictive judgments before barring the possession of weapons by convicted criminals, illegal aliens, or perhaps even children. We do not think the public, in ratifying the Second Amendment, would have understood the right to be so expansive and limitless. At its core, the Amendment protects the right of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller,* 554 U.S. at 635. Whether a certain crime removes one from the category of "law-abiding and responsible," in some cases, may be a close question. For example, the crime leading to the firearm prohibition in

*Schrader*—a misdemeanor arising from a fistfight—may be open to debate. Those who commit felonies however, cannot profit from our recognition of such borderline cases. For these reasons, we hold that those convicted of felonies are not among those entitled to possess arms. *Accord Hamilton,* 848 F.3d at 624.

**B.**

Having established that a felony conviction removes one from the scope of the Second Amendment, Medina's claim presumptively fails at the first step of the *Schrader* analysis. In his as-applied challenge, however, Medina argues that an examination of his "present, complete character" places him back within the class of "law-abiding, responsible citizens." We disagree.

We need not decide today if it is ever possible for a convicted felon to show that he may still count as a "law-abiding, responsible citizen." To prevail on an as-applied challenge, Medina would have to show facts about his conviction that distinguishes him from other convicted felons encompassed by the § 922(g)(1) prohibition. Medina has not done so. He was convicted of felony fraud—a serious crime, *malum in se*, that is punishable in every state. "American courts have, without exception, included [fraud] within the scope of moral turpitude." *Jordan v. De George*, 341 U.S. 223, 229 (1951). Moreover, just a few years after the end of his probation for his first crime, Medina was convicted of three more counts of misdemeanor fraud. This disregard for the basic laws and norms of our society is precisely what differentiates a criminal from someone who is "law-abiding." To the extent that it may be possible for a felon to show that his crime was so minor or regulatory that he did not forfeit his right to bear arms by committing it, Medina has not done so.

Nor can Medina's present contributions to his community, the passage of time, or evidence of his rehabilitation un-ring the bell of his conviction. While these and other considerations may play a role in some as-applied challenges to firearm prohibitions, such as those brought by misdemeanants or the mentally ill, we hold that for unpardoned convicted felons such as Medina, they are not relevant. *Accord Hamilton,* 848 F.3d at 626. When the legislature designates a crime as a felony, it signals to the world the highest degree of societal condemnation for the act, a condemnation that a misdemeanor does not convey. The commission of a felony often results in the lifelong forfeiture of a number of rights, including the right to serve on a jury and the fundamental right to vote. *See, e.g.*, 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement). A prohibition on firearm ownership, like these other disabilities, is a reasonable consequence of a felony conviction that the legislature is entitled to impose without undertaking the painstaking case-by-case assessment of a felon's potential rehabilitation.

Because we conclude that convicted felons are excluded from the scope of the Second Amendment, and that nothing about Medina's crime distinguishes him from other felons, Medina's claim fails. Because the claim fails at the first step of the *Schrader* analysis, we need not reach the second step.

## V. Conclusion

The Supreme Court said that laws barring the possession of firearms by convicted felons are presumptively lawful. The historical record and the decisions of other circuits reinforce this. Medina has not presented evidence in this case that

overcomes this presumption. We therefore affirm the decision of the district court.