IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, <br><br> Respondent, <br><br> v. <br><br> CHRISTOPHER ELLIS HAMILTON, <br><br> Appellant. | No. 85055-5-I (consolidated with No. 87053-0-I) <br><br> DIVISION ONE <br><br> PUBLISHED OPINION |

HAZELRIGG, A.C.J. — Christopher Ellis Hamilton appeals from the judgment and sentence (J&S) imposed pursuant to his conviction for vehicular homicide on the basis of disregard for the safety of others after a jury trial. He argues that Washington's statutes that restrict the firearms rights of persons with felony convictions violate the Second Amendment to the United States Constitution as applied to him. He also argues that remand is required to strike certain legal financial obligations (LFOs) from his J&S based on his indigency and recent statutory amendments. We reject Hamilton's constitutional challenge and affirm in part, but reverse in part and remand for the limited purpose of addressing the LFOs.

FACTS

Christopher Hamilton was charged with vehicular homicide and vehicular assault after the truck he was driving crossed a double yellow line into oncoming traffic and struck another vehicle, killing the front seat passenger. An officer who

responded to the scene observed signs of intoxication in Hamilton and he admitted to consuming alcohol and Suboxone[1] prior to the accident. However, subsequent blood analysis conducted pursuant to a search warrant was negative for those substances, but positive for alprazolam.[2] Hamilton was transported to a hospital after the accident and, based on the observations of care providers upon his admission, transferred to another facility for care where he was diagnosed with epilepsy. His theory at trial was that he was not criminally liable because the accident was the result of an unforeseen medical incident. The jury convicted Hamilton of the felony offense of vehicular homicide on the basis of "disregard for the safety of others," a violation of RCW 46.61.520(1)(c).[3] The jury hung on the vehicular assault charge but convicted Hamilton of the lesser included gross misdemeanor offense of driving under the influence (DUI). Hamilton had no felony convictions prior to this case.

The trial court imposed a sentence at the low end of the standard range. Due to his felony conviction, the court notified Hamilton that he could no longer possess firearms and was required to surrender his concealed pistol license and any firearms in his possession. The court also imposed a standard community

---

[1] Suboxone is a brand name for a combination of the controlled substances buprenorphine and naloxone, which can be used for the treatment of opioid dependence.

[2] Alprazolam is a controlled substance commonly used for the treatment of anxiety and panic disorders. The parties referred to "Xanax" throughout trial, which is a brand name for alprazolam.

[3] A person commits vehicular homicide when "the death of any person ensues within three years as a proximate result of injury proximately caused by" that person driving a vehicle while "under the influence" of drugs or alcohol, "[i]n a reckless manner," or "[w]ith disregard for the safety of others." RCW 46.61.520(1). The first two alternate means of vehicular homicide are deemed most serious, or "strike" offenses under the Sentencing Reform Act of 1981, chapter 9.94A RCW, but the "disregard for the safety of others" means of committing the crime is not. RCW 9.94A.030(32)(q). The "disregard for the safety of others" means is also exempted from the violent offense designation that applies to the other two alternate means. RCW 9.94A.030(58)(a)(xiv).

custody condition forbidding him from owning, using, or possessing a firearm or ammunition, consistent with the prohibition set out in RCW 9.94A.706. With regard to LFOs, the court imposed the then-mandatory $500 victim penalty assessment (VPA) and $100 DNA collection fee, an additional $300 in DUI-related fines under two motor vehicle statutes in Title 46 RCW, and $2,500 in emergency response costs assessed under RCW 38.52.430. Roughly two months after sentencing, the court entered an order finding Hamilton indigent.

Hamilton timely appealed.

ANALYSIS

I.      Loss of Firearm Rights Pursuant to Felony Conviction

Hamilton argues that the Washington statutes that stripped him of his firearm rights as a consequence of his felony conviction for vehicular homicide under the "disregard for the safety of others" means are unconstitutional as applied to him pursuant to the Second Amendment and *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022).[4]

The constitutionality of a statute is a question of law reviewed de novo. *State v. Zigan*, 166 Wn. App. 597, 603, 270 P.3d 625 (2012). A party may bring a facial or an as-applied constitutional challenge. *City of Redmond v. Moore*, 151 Wn.2d 664, 668, 91 P.3d 875 (2004). In considering such a question, we presume that the statute is constitutional. *State v. Batson*, 196 Wn.2d 670, 674, 478 P.3d

---

[4] Hamilton also references article I, section 24 of the Washington Constitution, which is "facially broader" than the Second Amendment. *State v. Rupe*, 101 Wn.2d 664, 706, 683 P.2d 571 (1984). Because Hamilton offers no argument regarding that provision, we decline to consider it. *See* RAP 10.3; *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (courts need not consider issues not supported by sufficient argument or authority).

75 (2020). The party disputing its constitutionality bears the burden of proving otherwise beyond a reasonable doubt. *Didlake v. State*, 186 Wn. App. 417, 422-23, 345 P.3d 43 (2015). To prevail in an as-applied challenge, a party must prove that an otherwise valid statute is unconstitutional as it was applied to that party. *Id.* at 423.

A.      Second Amendment Right To Bear Arms

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." "[T]he right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *United States v. Rahimi*, 602 U.S. 680, 690, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 778, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)).

However, "the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). In *Heller*, the Supreme Court held that a Washington D.C. law prohibiting handgun possession in the home was unconstitutional. *Id.* at 635. Notably, the Court clarified the Second Amendment right to possess firearms belongs to "law-abiding, responsible citizens" and emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," among other limitations. *Id.* at 626, 635. Such regulations, *Heller* specified, are "presumptively lawful." *Id.* at 627 n.26.

Two years later, in *McDonald*, the Supreme Court reaffirmed *Heller* and extended the individual Second Amendment right to the states through the Fourteenth Amendment to the United States Constitution, thereby invalidating a set of municipal statutes that banned handguns in homes. 561 U.S. at 749-50. The *McDonald* Court reaffirmed that its holding in *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626).

Following *Heller* and *McDonald,* courts developed a means-end scrutiny approach to assessing Second Amendment claims. *N.Y. State Rifle*, 597 U.S. at 18-19. First, the government could "justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood.'" *Id.* at 18 (alteration in original) (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019), *abrogated by N.Y. State Rifle*, 597 U.S. 1). "If the government can prove that the regulated conduct falls beyond the Amendment's original scope, 'then the analysis can stop there; the regulated activity is categorically unprotected.'" *Id.* (quoting *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012), *abrogated by N.Y. State Rifle*, 597 U.S. 1). "But if the historical evidence at this step is 'inconclusive or suggests that the regulated activity is *not* categorically unprotected,'" courts proceeded to balance the government's claimed interest against the burden imposed by its regulation, applying strict or intermediate scrutiny. *Id.* (quoting *Kanter*, 919 F.3d at 441). In applying this test, every federal court of appeals to consider a facial challenge to the federal felon-in-

possession statute has rejected it.[5]  *United States v. Williams*, 113 F.4th 637, 644 (6th Cir. 2024).  When courts rejected as-applied challenges, they did so "based on *Heller*'s 'presumptively lawful' language and without historical analysis."  *Id.* at 644.  Those that sustained as-applied challenges did so where the underlying felony was nonviolent.  *Id.*

In 2022, the Supreme Court revisited and refined *Heller* in *New York State Rifle*.  There, the Court struck down a New York regulatory licensing program that required applicants to satisfy a "proper-cause requirement" to carry a handgun in public.  *N.Y. State Rifle,* 597 U.S. at 70-71.  In so holding, the Court firmly rejected the use of means-end scrutiny and established a new framework in its place.  *Id.* at 17.  First, courts must determine whether "the Second Amendment's plain text covers an individual's conduct."  *Id*.  If so, "the Constitution presumptively protects that conduct," and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id*.  In making this determination, courts must consider whether the challenged regulation is "relevantly similar" in light of "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 29.  The government need only "identify a well-established and representative historical *analogue*, not a historical *twin*."  *Id.*  Thus, "a modern-day regulation" need not be "a dead ringer for historical precursors" to withstand constitutional scrutiny.  *Id.*

Applying this framework, the *New York State Rifle* Court held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect

---

[5] 18 U.S.C. § 922(g)(1) makes it illegal for anyone convicted of "a crime punishable by imprisonment for a term exceeding one year" to possess a firearm.

an individual's right to carry a handgun for self-defense outside the home." *Id.* at 10. Significantly, the majority in *New York State Rifle* emphasized that it was reaffirming and clarifying *Heller* and *McDonald*, not abrogating the Court's reasoning in those cases. *Id.* The *New York State Rifle* majority also qualified its holding by emphasizing that the right is held by "law-abiding, responsible citizens." *Id.* at 70.

Recently, in *Rahimi*, the Supreme Court applied *New York State Rifle*'s two-step framework and rejected a facial challenge to the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits the possession of a firearm by an individual subject to a domestic violence restraining order. 602 U.S. at 701. In upholding the statute under *New York State Rifle*'s second step, the Supreme Court held that it was sufficiently analogous to "surety" and "going armed" laws in effect at the time of our nation's founding, and thus, "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 695-98. The *Rahimi* Court also reiterated *Heller*'s statement that prohibitions on the possession of firearms by persons with felony convictions are "'presumptively lawful.'" *Id.* at 699 (quoting *Heller*, 554 U.S. at 627 n.26).

The overwhelming majority of courts that have reconsidered the constitutionality of felon-in-possession laws post-*New York State Rifle* have rejected the contention that such laws are now unconstitutional.[6] *See, e.g., United States v. Head*, 734 F. Supp. 3d 806, 811-12 (N.D. Ill. 2024); *United States v.*

---

[6] The U.S. Supreme Court has yet to consider whether 18 U.S.C. § 922(g)(1), which makes it a crime for any person to possess a firearm if they have been convicted of an offense "punishable by imprisonment for a term exceeding one year," violates the Second Amendment.

*Gleaves*, 654 F. Supp. 3d 646, 649 (M.D. Tenn. 2023) (collecting cases); *United States v. Robinson-Davis*, No. 7:22-cr-00045, 2023 WL 2495805, at *2 (W.D. Va. 2023) (unpublished)[7] (collecting cases).  Most conclude that pre-*New York State Rifle* precedent is no longer binding and apply *New York State Rifle*'s historical analysis to uphold the challenged regulation.  *See, e.g., Williams*, 113 F.4th at 647 (*New York State Rifle* "demands a different mode of analysis"); *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) ("We must undertake the text-and-history inquiry the [*New York State Rifle*] Court so plainly announced and expounded upon at great length."); *United States v. Díaz*, 116 F.4th 458, 466 (5th Cir. 2024) (explaining dicta in pre-*New York State Rifle* cases "cannot supplant the most recent analysis set forth by the Supreme Court in *Rahimi*").

B.      Washington's Statutes Disarming Persons with Felony Convictions

Hamilton challenges the as-applied constitutionality of several Washington statutes that work in conjunction to strip a person's right to bear arms upon conviction for a felony.  RCW 9.41.047(1)(a) requires a convicting court to "notify the person, orally and in writing, that the person must immediately surrender all firearms and any concealed pistol license and that the person may not possess a firearm unless the person's right to do so is restored by the superior court that issued the order."  The court also notifies the Department of Licensing, which is then required to determine whether the defendant has a weapon permit that should be revoked and to notify other license-issuing authorities.  RCW 9.41.047(2).  RCW

---

[7] This opinion is unpublished and cited pursuant to GR 14.1(c) for the sole purpose of further illustrating how extensively this contention has been rejected.

9.41.045 and RCW 9.94A.706(1) direct the court to impose a condition of community custody that subjects the defendant to sanctions for possessing firearms. Moreover, if a person on community custody actually or constructively possesses a firearm, the supervising agency must report it to "local law enforcement or local prosecution for consideration of new charges." RCW 9.94A.706(1). Additionally, RCW 9.41.040(1)(a) provides that a person "is guilty of the crime of unlawful possession of a firearm in the first degree [a class B felony], if the person owns, accesses, has in the person's custody, control, or possession, or receives any firearm after having previously been convicted . . . in this state or elsewhere of any serious offense," while subsection (2) sets out the elements for unlawful possession in the second degree, a class C felony, resulting from convictions not addressed in subsection (1)(a). In some circumstances, a person with disqualifying convictions may petition the convicting court to have their firearm rights restored upon compliance with certain conditions. RCW 9.41.041(2).

The Washington Supreme Court has not yet considered the constitutionality of Washington's disarming statutes post-*New York State Rifle*. However, this court recently rejected a post-*New York State Rifle* challenge to RCW 9.41.040(1) in *State v. Ross*, 28 Wn. App. 2d 644, 537 P.3d 1114 (2023), *review denied*, 2 Wn.3d 1026 (2024). There, Ross was convicted of unlawful possession of a firearm in the first degree based on a prior conviction for burglary in the second degree, a serious offense. *Id*. at 645. Ross argued that under the Second Amendment and *New York State Rifle*, RCW 9.41.040(1) was unconstitutional as applied because the "government [could not] justify restricting the possession of firearms for those

with nonviolent felony convictions." *Id.* at 646. This court held that "consistent with *Heller*, *McDonald*, and *New York State Rifle*, the Second Amendment does not bar the state from prohibiting the possession of firearms by felons as it has done in RCW 9.41.040(1)." *Id.* at 651. This court then rejected Ross' attempt to distinguish the rights of those with convictions for violent felonies from persons with nonviolent felonies as follows:

> Neither *New York State Rifle* nor *Heller* frames the analysis in terms of violent versus nonviolent felons. Instead, both held that the Second Amendment protects the individual right of "'*law-abiding*, responsible citizens'" to possess firearms. *N.Y. State Rifle,* 597 U.S. at 26 (emphasis added) (quoting *Heller*, 554 U.S. at 635). Again, the [*New York*] *State Rifle* majority describes those who fall under the Second Amendment aegis as "law-abiding" citizens at least 11 times. The Court found that New York's licensing regime was unconstitutional because "it prevent[ed] *law-abiding* citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *N.Y. State Rifle*, 597 U.S. at 71 (emphasis added). Moreover, in setting forth the proper framework to assess constitutionality under the Second Amendment, the Court explained that courts should analyze how and why historically relevant regulations "burden a *law-abiding* citizen's right to armed self-defense." *N.Y. State Rifle*, 597 U.S. at 29 (emphasis added).
>
> Similarly, both *Heller* and *McDonald* specifically recognized the "longstanding prohibition on the possession of firearms by felons" as not violating the Second Amendment. *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786. Neither opinion distinguished violent felons from nonviolent felons and Ross offers no authority in support of such a distinction.

*Ross*, 28 Wn. App. 2d at 651-52 (one alteration in original).

Recently, in *State v. Bonaparte*, 32 Wn. App. 2d 266, 274-75, 554 P.3d 1245 (2024), Division Two of this court followed *Ross* and rejected the appellant's claim that his conviction for unlawful possession of a firearm in the first degree based on a predicate serious offense violated the Second Amendment as applied.

- 10 -

The *Bonaparte* court concluded that "the framework articulated in *New York State Rifle* of the government's need to demonstrate that a firearm restriction is 'consistent with this Nation's historical tradition' applies to restrictions on a law-abiding citizen's right to bear arms and is simply not applicable here because Bonaparte has been convicted of a felony, first degree assault, which is a serious offense." *Id.* at 276.

While the State urges us to simply follow our prior cases, *Ross* and *Bonaparte* did not engage in the textual-historical analysis announced in *New York State Rifle*. The parties here appear to agree that *New York State Rifle* requires new analysis of the issue. We therefore apply *New York State Rifle* to the question of whether the Washington statutes that restrict Hamilton's firearms rights are unconstitutional as applied to him.

C. Application of *New York State Rifle* To Washington's Disarming Statutes

Washington's statutes restricting the firearm rights of those with felony convictions are constitutional as applied to Hamilton. As to *New York State Rifle*'s first step, we presume that felons are among "the people" protected by the Second Amendment. *See Rahimi*, 602 U.S. 690-92 (assuming defendant was protected by Second Amendment and deciding case based on *New York State Rifle*'s second step); *Heller*, 554 U.S. at 580 (noting "the people" "unambiguously refers to all members of the political community, not an unspecified subset"); *Diaz*, 116 F.4th at 467 ("[T]he 'two-step' view of [*New York State Rifle*] is effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation.").

As to *New York State Rifle*'s second step, we conclude that disarming those with felony convictions is demonstrably consistent with America's historic tradition of firearms regulation. Common law has a long history of disarming individuals, or categories of individuals, who were viewed as a danger to public order. *See Williams*, 113 F.4th at 650-57 (providing detailed historical summary and concluding "governments in England and colonial America long disarmed groups that they deemed to be dangerous"); Joseph G.S. Greenlee, *The Historical Justification For Prohibiting Dangerous Persons From Possessing Arms*, 20 WYO. L. REV. 249, 272 (2020) ("[T]he historical justification for felon bans reveals one controlling principal that applies to each historical period: violent or otherwise dangerous persons could be disarmed."); R. Brian Tracz, Comment, *Bruen and the Gun Rights of Pretrial Defendants*, 172 U. PENN. L. REV. 1701, 1719 (2024) (providing historical overview showing "substantial burdens were placed on the rights of dangerous people to possess firearms before, at, and directly after the founding"). Groups of people who were categorized as presenting a danger to the public order during that era of our nation's history included American Indians, Catholics, Quakers, slaves, and freed Black people. Such restrictions are repugnant and would fail modern constitutional scrutiny, but they nevertheless demonstrate historical precedent for restricting the firearms rights of persons perceived to be dangerous. *See* Greenlee, 20 WYO. L. REV. at 286 ("While many of these bans have been unjust and discriminatory, the purpose was always the same: to disarm those who posed a danger."); Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and*

*Misunderstood Provision*, 46 CONN. L. REV. 1463, 1474 (2014) ("[C]ertain categories of people, though changing in description, have always been subjectively deemed too dangerous, too radical, or too unpredictable to have weaponry.").

Hamilton asserts that the State cannot prove that Washington's disarming statutes address a societal problem that existed at the time of our nation's founding. *See N.Y. State Rifle*, 597 U.S. at 26 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."). It is true that there were no express firearms bans based on felony status at the time of our nation's founding. The first federal law prohibiting persons with felony convictions from possessing firearms was passed in 1938 and applied only to those convicted of "a crime of violence." Federal Firearms Act, ch. 850, § 2(f), 52 Stat. 1250, 1251 (1938). Disarmament was expanded to all people with felony convictions in 1961. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, § 2, 75 Stat. 757 (1961).[8] However, disarming those with felony convictions is fully consistent with America's tradition of firearm regulation. *See N.Y. State Rifle*, 597 U.S. at 30 (the government need demonstrate only a historical analogue, not a "dead ringer" or "historical *twin*."); *Rahimi*, 602 U.S. 691 ("These precedents were not meant to suggest a law trapped in amber."); Tracz, 172 U. PENN. L. REV. at 1727 ("[T]he survey of these [historical] periods suggests

---

[8] The Federal Firearms Act and An Act to Strengthen the Federal Firearms Act were both repealed by the Gun Control Act of 1968, 18 U.S.C. § 921.

that there is a tradition of disarming particular persons who pose an elevated risk of physical danger to the public. It also suggests that there is a tradition of disarming categories of persons found to be rebellious, seditious, or physically dangerous."). Here, the disarming of those who posed a threat of violence to others is the historical analogue.

At the time of our nation's founding, "[f]elonies were so connected with capital punishment that it was 'hard to separate them.'" *Medina v. Whitaker*, 913 F.3d 152, 158 (2019) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *98 (Harper ed. 1854)). The death penalty served as a means for "'preventing crimes in the future; [and] it was also a backward-looking effort at purging the community of guilt for crimes committed in the past.'" *Williams*, 113 F.4th at 658 (alteration in original) (quoting STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 15 (2009)). "The key idea was that capital punishment would 'prevent existing criminals from repeating their crimes.'" *Id.* (quoting BANNER, *supra*, at 13). The range of felony cases punishable by death then was quite broad, and "included nonviolent offenses that we would recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158. Early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property. *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024). "[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at

158. Washington has eliminated the death penalty, the ultimate deprivation of individual rights, but a mandatory life sentence without parole similarly subsumes disarmament.

Hamilton argues that the Washington statutes that disarmed him are unconstitutional as applied to him because the facts surrounding his felony conviction involved a "tragic accident" rather than the use of a firearm or political activity. He points out that our legislature declined to classify vehicular homicide as a violent offense where, as here, the conviction is based solely on "disregard for the safety of others." RCW 46.61.520(1)(c); *see also State v. Stately*, 152 Wn. App. 604, 610, 216 P.3d 1102 (2009). Nevertheless, Hamilton committed a felony offense that resulted in the death of another person. His behavior places him squarely in the category of persons deemed dangerous to the public order for the purpose of historical firearms regulation.

Hamilton also points to several cases that applied the *New York State Rifle* test to hold that the federal felon-in-possession statute was unconstitutional as applied, but none compel a different outcome. In *United States v. Duarte*, a three-judge panel held that 18 U.S.C. 922(g)(1) was unconstitutional as applied to Duarte, a nonviolent felon. 101 F.4th 657, 691, *vacated on reh'g,* 108 F.4th 786 (9th Cir. 2024). But the Ninth Circuit subsequently granted rehearing en banc and vacated *Duarte* after the issuance of *Rahimi. See* 108 F.4th 786 (9th Cir. 2024). In *United States v. Daniels*, the court held that a federal statute disarming unlawful drug users was unconstitutional as applied. 77 F.4th 337, 340 (5th Cir. 2023), *vacated and remanded,* 144 S. Ct. 2707 (2024). But the U.S. Supreme Court

vacated and remanded *Daniels* for reconsideration in light of *Rahimi*. *See* 144 S. Ct. 2707 (2024). In *Range v. Attorney General United States*, the Third Circuit concluded that the federal felon-in-possession statute was unconstitutional as applied to an individual who was convicted of making a false statement to obtain food stamp assistance more than two decades prior. 124 F.4th 218, *vacated and remanded sub nom. Garland v. Range,* 144 S. Ct. 1706 (2024). But the *Range* court noted that its decision was "narrow" and emphasized that "the record contains no evidence that Range poses a physical danger to others." *Id.* at 232. Here, in contrast, Hamilton's actions undisputedly caused the death of another person. Hamilton also cites several district court cases holding that the federal felon-in-possession statute is unconstitutional, but they are outliers and do not control here. *See United States v. Leblanc*, 707 F. Supp. 3d 617 (M.D. La. 2023); *United States v. Prince*, 700 F. Supp. 3d 663 (N.D. Ill. 2023); *United States v. Bullock*, 679 F. Supp. 3d 501 (S.D. Miss. 2023).

Hamilton does not prevail on his as-applied challenge.

II.     Legal Financial Obligations

Hamilton next argues that remand is necessary to strike the $500 VPA and $100 DNA collection fee from his J&S. The State concedes that the VPA and DNA collection fee should be stricken under recent statutory amendments. Effective July 1, 2023, RCW 7.68.035(4) prohibits courts from imposing the VPA on "indigent" defendants as defined in RCW 10.01.160(3). *State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). The $100 DNA collection fee was also eliminated for all defendants. *Id.* at 17. Although these amendments took effect after

Hamilton's sentencing, they apply to cases pending on appeal. *Id.* at 16. Here, the trial court entered a postsentencing order finding Hamilton indigent. We accept the State's concession and remand for the trial court to strike the $500 VPA and $100 DNA collection fee.

Hamilton also argues that because he is indigent, remand is warranted to strike the additional $50 fee imposed pursuant to Title 46 RCW, $250 alcohol violator fee, and $2,500 in emergency response costs assessed under RCW 38.52.430.

The State concedes that remand is warranted to strike the $50 Title 46 fee and $250 alcohol violator fee based on Hamilton's indigency. RCW 46.64.055(1) requires a person convicted of certain driving offenses to pay a $50 fee for any violation of Title 46 RCW. Similarly, RCW 46.61.5054(1)(b) states that upon petition, the court "may suspend payment of all or part of the [$250] fee if it finds that the person does not have the ability to pay." In the interest of judicial economy, the State indicated that it has no objection to striking these discretionary LFOs without further proceedings. Trial courts are prohibited from imposing discretionary LFOs on indigent defendants. *State v. Ramirez*, 191 Wn.2d 732, 746, 426 P.3d 714 (2018); RCW 10.01.160(3). We accept the State's concession and remand for the trial court to strike these fees based on Hamilton's indigency.

However, the State does not concede that the $2,500 emergency response fee was improperly imposed. RCW 38.52.430 provides in relevant part that a "person whose intoxication causes an incident resulting in an appropriate emergency response, and who, in connection with the incident, has been found

guilty of . . . driving while under the influence of intoxicating liquor or any drug . . . is liable for the expense of an emergency response by a public agency to the incident." This fee "shall" be imposed "[u]pon a finding by the court that the expenses are reasonable." RCW 38.52.430. "The general rule is that the word 'shall' is presumptively imperative and operates to create a duty rather than conferring discretion." *State v. Bartholomew*, 104 Wn.2d 844, 848, 710 P.2d 196 (1985). Unlike the other LFOs at issue in this appeal, RCW 38.52.430 contains no waiver provision based on a determination of indigency. Thus, to the extent Hamilton contends that the emergency response fee should be waived on the basis of indigency, we reject his argument.

But, as Hamilton correctly notes, the record does not reflect "a finding by the court that the expenses are reasonable" as the statute requires. Additionally, the record before this court does not appear to contain evidence supporting the expenses. We remand to allow the State to present evidence in support of its request for this cost and for the trial court to exercise its discretion in considering whether the expenses were reasonable.

Affirmed in part, reversed in part, and remanded for correction of the J&S consistent with this opinion.

WE CONCUR:

Díaz, J.

- 18 -