IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                Respondent,

    v.

ROBERT DEAN LEWIS,

                Appellant.

No. 86431-9-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Robert Dean Lewis appeals his convictions for two counts of assault in the second degree and one count of unlawful possession of a firearm (UPF) in the second degree. He contends that the trial court erred in "admitting" the testimony of the two assault victims "identifying Mr. Lewis in court" because such testimony was unreliable and allowing it violated his right to due process. He also asserts that his UPF conviction under RCW 9.41.040 violates his right to bear arms under the Second Amendment and article I, section 24 of the Washington Constitution because his predicate felony conviction was non-violent. We need not address Lewis's due process claim because neither victim identified Lewis in court, and we disagree with his UPF assertion. Accordingly, we affirm.

FACTS

In the early hours of the morning on December 17, 2021, Sharanpreet Singh and his co-worker, Lovish Kalia, were working at a gas station and convenience store in

Auburn, Washington. A person wearing a black hoodie, black hat and face mask entered the store and asked Singh for a pack of cigarettes.

Because the person was wearing a face mask, Singh asked the person to lower it in order to verify the person's age with the identification he presented. Singh refused to sell him cigarettes after determining the buyer did not match the identification presented. The person became angry, cursed at Singh, and left the store.

Moments later, the person pulled out a handgun, turned toward the gas station, and fired four shots into the store, nearly hitting Singh and Kalia, before fleeing in a black Nissan car. Kalia then called the police following the shooting incident.

Surveillance video captured the sequence of events inside and outside the store. The video only captured the lower portion of the person's exposed face starting from below his eyes as well as the back of his right hand which he used to pull down the mask. There are multiple dark markings on the back of the hand. Because the store's surveillance system was so old, it could not be downloaded onto a digital device. Kalia, instead, used his cell phone to take a video recording of the surveillance footage and a still photograph of the moment in the video when the person's mask was pulled down. Kalia shared the video and the still photograph with Auburn Police. Surveillance video also captured the license plate of the fleeing vehicle, which the vehicle owner had attempted to report as stolen prior to the shooting.[1] Responding police officers also found four spent 9 mm shell casings outside of the store in the parking lot.

Auburn Police Officer Brian Cox distributed by email the still photograph, later admitted at trial as Exhibit 10, to the entire patrol and investigations divisions in hopes

_____

[1] The owner of the stolen Nissan was unable to successfully report his vehicle stolen due to an unidentified issue with King County jurisdiction.

that someone would recognize the shooter. Detective Andy Lindgren immediately responded to the email after viewing the photograph stating "Robert Lewis[???]"[2] The response apparently was not just sent to Cox, but also to others on the email thread, including members of the major crimes unit. Lindgren believed the person was Lewis based on Lindgren's prior contacts with Lewis and the person's jawline and facial features in the photograph.

Detective Douglas Faini created a six-photo montage of five different white males and a photograph of Lewis.[3] The photo montage contained single numbered photographs of the six individuals and one sheet of all six photographs that listed the names of the individuals associated with each photograph. The number 3 photograph was that of Lewis.

The day after the shooting, Cox, a patrol officer, administered the montage identification procedure to Kalia that included reading standard warnings including that it was possible that the person who committed the crime may or may not be in the group of photographs and that Kalia was not obligated to identify anyone. Cox did not share the sheet with the identifying information of the people in the montage. The instructions directed Kalia to study each photograph before making comments and then Cox was to ask a set of standard questions after Kalia viewed the montage. When Kalia got to the third photograph he put his finger down on the photograph. Before Kalia viewed the rest of the photographs, Cox and Kalia discussed Kalia's selection. As Cox testified to later

---

[2] The verbatim report of proceedings transcribes Lindgren confirming on cross examination that he responded to Cox's email with "Robert Lewis, question mark, question mark, question mark."

[3] Because Lewis had an exposed neck tattoo in his photograph, Faini covered that spot with a black dot and did the same on all other photographs in the montage.

in trial, "We discussed that briefly – how do you know – what do you think? How do you think you know this person? Etc., etc." Kalia circled the number 3, which Cox explained is standard practice for identifying a suspect. Kalia then explained to Cox why he believed this person was the shooter and wrote down his explanation on the same sheet as Lewis' photograph. Kalia wrote "This look like little bit, but I'm not sure about. There is approximately … ten percent like that from lips and chin." Kalia then quickly looked at the remaining three photographs without comment.

The same day, Auburn Police Sergeant Shaun Feero administered a copy of the same photo montage packet to Singh. Singh also selected Lewis's photograph. At the time Feero was sergeant in the major crimes unit and was responsible for overseeing all of the detectives within major crimes and assigning cases on a daily basis. Feero administered the montage as the instructions directed. Singh also picked Lewis's photograph, noting that the person "has the same facial features." Singh also noted that he was "50/50% sure" and stated the event was "very traumatic" for him. Singh also said his "stress level from the incident was very high, however I may have seen [the person in photograph number 3] that night." Singh and Kalia are non-native English speakers.

On January 6, 2022, Lewis was arrested by police and taken into custody for an unrelated crime. While Lewis was being arrested, police photographed his hands documenting several tattoos on the back of his right hand. The largest tattoo was that of a star created by the outline of two intersecting triangles with the center not filled in. The shape could be viewed as consistent with what appears on the back of the right hand of the person captured in the surveillance video from the December shooting incident.

The State charged Lewis with two counts of assault in the second degree and one count of unlawful possession of a firearm in the second degree.

At trial, Lewis did not move to suppress testimony related to identifying Lewis through the photo montages. Nor did Lewis argue that the identifications from Kalia and Singh were obtained through a suggestable procedure. Instead, Lewis moved to prohibit witnesses from identifying Lewis in court as the person who committed the assaults because both Kalia's and Singh's montage identifications were "kind of equivocal" and identifying Lewis in the courtroom is in a context that is highly suggestive. Lewis recommended limiting the State to the identification that was made through the photo montages. The trial court denied the motion to bar in-court identifications, reasoning that whether the identification is reliable is

> for [the parties] to unravel for the jury. And the jury is going to make determinations based on the weight they give, the credibility of the witnesses, taking all the factors that the Court advises them on and the Instructions.

The trial court did grant Lewis' motion to prohibit the State from saying that anyone "positively" identified Lewis.

At trial, a Punjabi interpreter was made available to both Singh and Kalia. Kalia testified in English and never requested the assistance of the interpreter. Singh testified in Punjabi.

Prior to their testimony the State informed the court that it intended to introduce the two photo montages, one shown to Kalia and one to Singh. The State represented that "those are going to be, I believe, agreed to come in as evidence." Defense responded that this was a "fair summation" of the parties' prior discussion.

5

Lewis again objected to any in-court identifications by Singh or Kalia, arguing that that would be impermissibly suggestive and unduly prejudicial. The trial court reaffirmed its earlier ruling permitting in-court identifications, noting that any such testimony would be subject to cross-examination and that the State would not present the identifications through the photo montages as "positive identification."

At trial, Kalia confirmed his selection and comments made when he was shown Exhibit 11, the photo montage he was previously shown and signed. When asked whether he could identify the shooter in the courtroom, Kalia initially answered "maybe" and then pointed to someone seated in the back of the courtroom who was not Lewis.[4] Kalia confirmed this identification on cross examination. The State agreed that Kalia could be excused after the cross-examination.

Singh testified confirming his selection and the comments made when he was shown Exhibit 13, the photo montage he was previously shown and signed. Singh was not asked to make an in-court identification of the shooter. At the end of direct examination, the prosecutor asked Singh if he could see the prosecutor's face when he was crouched behind the computer screen. Singh answered no. On cross examination, Singh clarified that when he said he was "50/50 sure" as to his montage selection, that meant that the person in the photograph may or may not be the person Singh saw during the incident.

After excusing the jury, the State asked to call the interpreter as a witness to testify what the interpreter had shared with the prosecutor after Kalia testified, that from

---

[4] The record suggests the person Kalia identified was a young deputy prosecuting attorney.

where the interpreter was sitting next to Kalia on the witness stand, Lewis was behind computer screens and could not be seen. The court denied the State's request.

Cox and Feero both testified regarding the administration of the photo montages and the department's identification procedures. Though both Cox and Feero respectively acknowledged that Kalia and Singh were non-native English speakers, they testified that they were able to communicate with one another, though it may have been a little bit more difficult to do so.

Lindgren testified to immediately identifying the person from the still photograph of the surveillance video as Robert Lewis when he received the email distribution from Cox. Lindgren testified that he had more than one contact with Lewis before December 16, 2021, and that he focused on the person's facial features and jawline in the photograph distributed in Cox's email. Lindgren testified that he had been investigating Lewis for several other cases and arrested Lewis on January 6, 2022. At that time, he noticed tattoos on his hand, which were later photographed when Lewis was booked into custody. The court admitted those photographs, Exhibit 14. The photograph shows multiple tattoos on the back of Lewis's right hand. The largest tattoo was the depiction of a star.

Lindgren was asked if he saw Lewis in the courtroom. Lindgren testified that he believed he was sitting at a table, but that he was blocked by a computer and asked to stand up to have a clear visual of the person's face. After the court allowed Lindgren to step off the stand to get a better vantage point, Lindgren identified the defendant as Lewis.

At the conclusion of the trial, the jury convicted Lewis on all counts.[5] He was sentenced to a total of 120 months.

Lewis appeals.

DISCUSSION

<u>In-court Identification</u>

Lewis assigns error to the trial court admitting Kalia's and Singh's "unreliable testimony identifying Mr. Lewis in court." Specifically, Lewis contends that the "trial court erred in not suppressing the courtroom identifications of Mr. Lewis by two clerks. They were unreliable and gained from suggestive procedures." The State correctly observes that because neither store clerk, Kalia nor Singh, identified Lewis in the court, there is nothing to review. We agree.

The due process clause protects against the admission of evidence derived from improper identification procedures. <u>Neil v. Biggers</u>, 409 U.S. 188, 196, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); U.S. CONST. amend. XIV. "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." <u>Perry v. New Hampshire</u>, 565 U.S. 228, 238-39, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012) (citing <u>Manson v. Brathwaite</u>, 432 U.S. 98, 107, 109, 112-13, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)). Courts employ a two-part analysis to determine whether the challenged identification is admissible. <u>State v. Vickers</u>, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). First, the defendant must establish that "the identification procedure was impermissibly suggestive." <u>Id.</u> If the defendant fails, the inquiry ends. Only if the defendant carries the burden of showing the identification procedure was impermissibly

---

[5] Lewis moved to arrest the judgment after the verdict based on the lack of evidence. The trial court denied the motion. Lewis does not renew this issue on appeal.

suggestive does the court then consider, "based upon the totality of the circumstances, whether the procedure created a substantial likelihood of irreparable misidentification." Id. The "substantial likelihood of irreparable misidentification" is measured against five indicia of reliability enumerated in Biggers, 409 U.S. at 198 (the "Biggers factors"). These factors include (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the procedure; and (5) the time between the crime and the identification procedure. Only where these "aspects of reliability" are "'outweighed by the corrupting effect' of law enforcement suggestion" should the identification be suppressed. State v. Derri, 199 Wn.2d 658, 674-75, 511 P.3d 1267 (2022) (quoting Braithwaite, 432 U.S. at 106).

During motions in limine, Lewis moved to bar Singh and Kalia from making an in-court identification of Lewis because their prior identification through photo montages were equivocal and allowing for identification in the courtroom context would be overly suggestive. The court denied that motion. But Singh was never asked if he recognized the shooter in the courtroom. And when asked, Kalia identified someone in the back of the courtroom who was not Lewis.

Lewis also argues, for the first time on appeal, that the montage procedures administered to Singh and Kalia were unnecessarily suggestive and tainted the reliability of the in-court identification. We need not analyze whether the in-court identification by the clerks were reliable because there was no in-court identification of Lewis.

Lewis argues, for the first time before us in his reply brief, that "Kalia's identification of Mr. Lewis from the photo montage should have been suppressed, and should not have been a permissible basis for him to attempt an in-court identification." First, Lewis did not move to suppress the identification of Lewis from the photo montage. In fact, Lewis suggested the court limit the clerks' identification of Lewis to how they identified him through the montage, and Lewis agreed that the montages were admissible. He has waived this claim of evidentiary error. Second, to the extent Lewis's reply brief could be read to suggest that the admission of the identification of Lewis from the photo montage can be raised for the first time on appeal as a manifest constitutional error, Lewis waited until his reply brief to do so. See RAP 2.5(a)(3). "'[A] contention presented for the first time in the reply brief will not receive consideration on appeal.'" State v. Tien Thuy Ho, 8 Wn. App. 2d 132, 140-41, 437 P.3d 726 (2019) (alteration in original) (quoting Fosbre v. State, 70 Wn.2d 578, 583, 424 P.2d 901 (1967)).

Second Amendment Violation

*a. Waiver*

Next, Lewis asserts that his UPF conviction under RCW 9.41.040 is unconstitutional because as applied to him it violates his Second Amendment rights. The State argues that Lewis waives this claim because he raises it for the first time on appeal.

Appellate courts generally decline to consider issues that were not properly raised before the trial court. RAP 2.5(a). However, RAP 2.5(a)(3) provides an exception allowing review of a "manifest error affecting a constitutional right." An error is considered manifest if the appellant can demonstrate actual prejudice resulting in

practical and identifiable consequences at trial. State v. J.W.M., 1 Wn.3d 58, 91, 524

P.3d 596 (2023). The appellant must make a plausible showing that the claimed

constitutional error had such consequences. Id. It is well settled that being charged and

convicted under an unconstitutional statute constitutes a manifest error affecting a

constitutional right. State v. Rice, 174 Wn.2d 884, 893, 279 P.3d 849 (2012). We thus

consider whether the challenged statute is constitutional as applied to Lewis.

*b. RCW 9.41.040 Challenge*

Lewis contends that RCW 9.41.040 is unconstitutional as applied to him because

the predicate felony for which the State relied on to support the UPF conviction is a non-

violent offense, attempting to elude a pursing police vehicle. He further argues, relying

on N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 8-9, 142 S. Ct. 2111, 213 L.

Ed. 2d 387 (2022), that the State cannot show a historical basis for preventing persons

convicted of non-violent felonies from possessing firearms. We disagree.

Washington State's unlawful possession of a firearm statute provides:

> (2)(a) A person, whether an adult or juvenile, is guilty of the crime of
> unlawful possession of a firearm in the second degree, if the person does
> not qualify under subsection (1) of this section for the crime of unlawful
> possession of a firearm in the first degree and the person owns, accesses,
> has in the person's custody, control, or possession, or receives any
> firearm:
>
> (i) After having previously been convicted or found not guilty by reason of
> insanity in this state or elsewhere of:
>
> (A) Any felony not specifically listed as prohibiting firearm possession
>     under subsection (1) of this section;

RCW 9.41.040(2)(a)-(A).

We review constitutional issues de novo. City of Seattle v. Evans, 184 Wn.2d

856, 861, 366 P.3d 906 (2015). Statutes are presumed to be constitutional, and the

challenger of a statute has the burden to show unconstitutionality. Id. at 861-62. "An as-applied challenge to a statute's constitutionality requires examination of the statute in the specific circumstances of the case." State v. Ross, 28 Wn. App. 2d 644, 646, 537 P.3d 1114 (2023), review denied, 2 Wn.3d 1026, 544 P.3d 30 (2024).

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." However, this constitutional amendment is not without limits. Dist. of Columbia v. Heller, 554 U.S. 570, 595, 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).

This court, in State v. Hamilton, 33 Wn. App. 2d 859, 869, 565 P.3d 595 (2025), recently applied the two-step analysis from N.Y. State Rifle. Hamilton challenged Washington's statutes restricting firearm rights of persons with felony convictions as applied to him. Hamilton, 33 Wn. App. 2d at 861. We rejected his argument that barring him from possessing a firearm based on his conviction for vehicular homicide under the "disregard for the safety of others" prong was unconstitutional as applied to him pursuant to the Second Amendment and N.Y. State Rifle. Id. at 863, 875. In doing so, we acknowledged recent Washington cases that affirmed the restriction of the possession of firearms by felons without regard as to whether the predicate felony conviction was violent or nonviolent. Id. at 869-70 (citing State v. Bonaparte, 32 Wn. App. 2d 266, 274-75, 554 P.3d 1245 (2024); Ross, 28 Wn. App. 2d at 651-52). However, the parties in Hamilton appeared to agree that N.Y. State Rifle required a new analysis of the issue rather than simply relying on language from recent U.S. Supreme Court cases that did not directly consider the question of firearm restrictions based on someone's status as a felon. Hamilton, 33 Wn. App. 2d at 870. See Rahimi, 602 U.S.

680, 699, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024) (observing that "our [Heller] opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful'"); McDonald v. City of Chicago, Ill., 561 U.S. 742, 786, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) ("We repeat those assurances [from Heller] here" that "[w]e made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill'").

In applying the two-step analysis articulated in N.Y. State Rifle, under the first step, we presumed that felons are among "the people" protected by the Second Amendment. Hamilton, 33 Wn. App. 2d at 870. In the "second step, we conclude that disarming those with felony convictions is demonstrably consistent with America's historic tradition of firearms regulation." Id. at 871.

> Common law has a long history of disarming individuals, or categories of individuals, who were viewed as a danger to public order. *See Williams*, 113 F.4th at 650-57 (providing detailed historical summary and concluding "governments in England and colonial America long disarmed groups that they deemed to be dangerous"); Joseph G.S. Greenlee, *The Historical Justification For Prohibiting Dangerous Persons From Possessing Arms*, 20 WYO. L. REV. 249, 272 (2020) ("[T]he historical justification for felon bans reveals one controlling principal that applies to each historical period: violent or otherwise dangerous persons could be disarmed."); R. Brian Tracz, Comment, *Bruen and the Gun Rights of Pretrial Defendants*, 172 U. PENN. L. REV. 1701, 1719 (2024) (providing historical overview showing "substantial burdens were placed on the rights of dangerous people to possess firearms before, at, and directly after the founding").

Id. (alteration in original).

> It is true that there were no express firearms bans based on felony status at the time of our nation's founding. The first federal law prohibiting persons with felony convictions from possessing firearms was passed in 1938 and applied only to those convicted of "a crime of violence." Federal Firearms Act, ch. 850, § 2(f), 52 Stat. 1250, 1251 (1938). Disarmament was expanded to all people with felony convictions in 1961. See An Act to

13

Strengthen the Federal Firearms Act, Pub. L. No. 87-342, § 2, 75 Stat. 757 (1961). However, disarming those with felony convictions is fully consistent with America's tradition of firearm regulation. *See N.Y. State Rifle*, 597 U.S. at 30, 142 S.Ct. 2111 (the government need demonstrate only a historical analogue, not a "dead ringer" or "historical twin."); *Rahimi*, 602 U.S. at 691, 144 S.Ct. 1889 ("These precedents were not meant to suggest a law trapped in amber."); Tracz, 172 U. Penn. L. Rev. at 1727 ("[T]he survey of these [historical] periods suggests that there is a tradition of disarming particular persons who pose an elevated risk of physical danger to the public. It also suggests that there is a tradition of disarming categories of persons found to be rebellious, seditious, or physically dangerous.").

Id. at 872-73 (alterations in original) (footnote omitted).

At the time of our nation's founding, "[f]elonies were so connected with capital punishment that it was 'hard to separate them.'" *Medina v. Whitaker*, 913 F.3d 152, 158 (2019) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *98 (Harper ed. 1854)). The death penalty served as a means for " 'preventing crimes in the future; [and] it was also a backward-looking effort at purging the community of guilt for crimes committed in the past.'" *Williams*, 113 F.4th at 658 (alteration in original) (quoting STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 15 (2009)). "The key idea was that capital punishment would 'prevent existing criminals from repeating their crimes.'" *Id.* (quoting Banner, supra, at 13). The range of felony cases punishable by death then was quite broad, and "included nonviolent offenses that we would recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158.

Id. at 873 (alteration in original).

In Hamilton, we also observed more recent cases addressing unconstitutional as

applied challenges by nonviolent felons:

In *United States v. Duarte*, a three-judge panel held that 18 U.S.C. 922(g)(1) was unconstitutional as applied to Duarte, a nonviolent felon. 101 F.4th 657, 691, *vacated on reh'g*, 108 F.4th 786 (9th Cir. 2024). But the Ninth Circuit subsequently granted rehearing en banc and vacated *Duarte* after the issuance of *Rahimi*. *See* 108 F.4th 786 (9th Cir. 2024). In *United States v. Daniels*, the court held that a federal statute disarming unlawful drug users was unconstitutional as applied. 77 F.4th 337, 340 (5th Cir. 2023), *vacated and remanded*, —— U.S. ——, 144 S. Ct. 2707, 219 L.Ed.2d 1313 (2024). But the U.S. Supreme Court vacated and

> remanded *Daniels* for reconsideration in light of Rahimi. *See* —— U.S. ——
> –, 144 S. Ct. 2707, 219 L.Ed.2d 1313 (2024). In *Range v. Attorney
> General United States*, the Third Circuit concluded that the federal felon-
> in-possession statute was unconstitutional as applied to an individual who
> was convicted of making a false statement to obtain food stamp
> assistance more than two decades prior. 124 F.4th 218 (3d Cir.), *vacated
> and remanded sub nom. Garland v. Range*, —— U.S. ——, 144 S. Ct.
> 2706, 219 L.Ed.2d 1313 (2024). But the Range court noted that its
> decision was "narrow" and emphasized that "the record contains no
> evidence that Range poses a physical danger to others." *Id.* at 232.

Id. at 874. The U.S. Supreme Court has declined to distinguish between violent and nonviolent felons in the context of firearm possession. Ross, 28 Wn. App. 2d at 652. As discussed in Hamilton, our nation's history of punishing people who committed nonviolent offenses by death subsumes disarming them. It follows that the N.Y. State Rifle majority qualified its holding by emphasizing that the Second Amendment right is held by "law-abiding, responsible citizens." 597 U.S. at 70. Regardless, Lewis's predicate felony of eluding a pursuing police vehicle, by its nature, creates an elevated risk of physical danger to the public. Lewis does not prevail on his as-applied challenge.

We affirm.

_____ Coburn, J.

WE CONCUR:

_____, ACJ      _____ Mann, J.

15